875 A.2d 146

**Martin Todd CAIN**

v.

**STATE of Maryland.**

**No. 1943, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

June 1, 2005.

Bradford C. Peabody (Nancy S. Forster, Public Defender on the brief), Baltimore, MD, for Appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER, SHARER, JJ., and CHARLES E. MOYLAN, JR., (Retired, Specially Assigned).

HOLLANDER, J.

In this appeal, we must consider the conduct of Martin Todd Cain, appellant, who, in effect, sought to profit from the 9/11 disaster by posing as a good samaritan. Cain's conduct led a jury sitting in the Circuit Court for Wicomico County (Beckstead, J., presiding) to convict him of theft over $500, for which he was subsequently sentenced to eight years' imprisonment. On appeal, Cain asks:

Was the evidence sufficient to sustain the conviction of felony theft?

For the reasons set forth below, we shall affirm.

## FACTUAL SUMMARY

Following the terrorist attacks of September 11, 2001, appellant, who owned Cain Concrete Imprints ("CCI") in Salisbury, Maryland, purportedly sought to assist with the relief efforts in New York City. According to Dawn Mitchell, the news director for WMDT Television, Channel 47, appellant contacted the television station on September 11, 2001, and asked "us to do a news story on his efforts to contribute to the tragedy that happened that very morning...." He explained that "[h]e was collecting donations, any type of thing that could be of assistance to the 9/11 fund and efforts to get everything up to New York." Mitchell testified that the story aired on three newscasts that evening.

As part of the story, appellant was interviewed on camera and viewers were told to send donations to CCI. The address and telephone number for CCI were also provided. The following day, September 12, 2001, viewers were told to send donations to Hebron Savings Bank.

Elsie Campbell, a retiree, testified that, after she saw the story about Cain on Channel 47, she mailed a donation to CCI "for the clean-up of the World Trade Center." Her donation, a check for $100, was dated September 12, 2001, and made payable to "Cain Concrete." Campbell explained that she sent the money, which was never refunded, because she "just felt so bad." She added that she never intended for appellant or CCI "to have that money." Ms. Campbell's check, drawn on an account with her husband, bears the following notation on the memo line: "Clean up of World Trade Center."

Dorothy Hudson, another retiree, testified that she sent a donation of $100 for the relief effort in New York, by way of a check drawn on a joint bank account with her husband. She sent her check, dated September 12, 2001, and made payable to "Cain Construction," after she "heard [about] it on TV. . . ." Hudson explained that the money was intended to "help with the 9/11 disaster" in New York. Her check, which was not returned, bears the notation, "Disaster Fund N.Y."

Patricia Thorp[1] testified that she saw appellant on television, explaining that "he was collecting money and trucks and heavy equipment" to assist in the relief effort in New York. Thereafter, she mailed a check dated September 12, 2001, for $50, payable to "Cain Concrete," to help with the relief effort. On her check, she noted that it was for the "New York Disaster." Thorp added that she had "absolutely" no intention of giving the money to CCI or to Cain personally.

In addition, Thorp convinced her employer to send a contribution of $500 on behalf of his business, Lloyd Saunders Roofing Corp., "to go to the people in New York." According to Thorp, that donation, by check dated September 12, 2001, payable to "Cain Concrete," was intended to assist with the relief effort in New York, and was not meant for CCI or Cain personally. The check reflects the following notation: "Dona-

---

1. At the time Patricia Thorp sent the check to CCI, her surname was Smith. We shall refer to her as Patricia Thorp, however, because that was her name at the time of trial.

tion/NY Disaster." Neither Thorp nor her employer was ever reimbursed.

Copies of the checks from Campbell, Hudson, Thorp, and Saunders were admitted into evidence.[2] Transcripts of the news broadcasts were also admitted into evidence, along with a videotape of the broadcasts.

Melody Carter, Vice–President of Hebron Savings Bank, worked at the branch located on Nanticoke Road in Salisbury. She testified that on September 12, 2001, appellant opened the "Red, White & Blue Strikes Back" account (the "Account" or the "RW & BSB Account"). Carter explained that deposits to the RW & BSB Account had to be made by check "[b]ecause we have to have a paper trail." In addition, the bank kept the receipts for all deposits and expenditures.

The Hebron Savings Bank records of all transactions regarding the RW & BSB Account were admitted into evidence. A total of $3,272.87 was deposited to the RW & BSB Account. No activity was shown on the Account after October 1, 2001. At the time of trial, there was $2,175.07 left in the Account.

When asked how disbursements were to be made from the RW & BSB Account, Carter responded: "They have to bring in receipts, and we have to keep the receipts. And if they ... tell us what they're for, we write it on there, take pictures of the check that's going to be disbursed and get it to the person." All withdrawals required the signatures of appellant and Carter, and the Account's checkbook was kept at the bank "at all times."

With regard to disbursements, Carter testified that appellant would come to the bank with the receipts, tell her what the receipts were for, she would add them up, and then issue a

---

2. In addition, the State sought to call Antoinette Cooper with respect to a $20 check that she donated. However, when called, Cooper did not appear. Nevertheless, Cooper's check was admitted into evidence, and was included in the calculations of monies donated to CCI for the New York relief effort and deposited to CCI's business bank account.

Cooper's check, dated September 12, 2001, was payable to "Cain Imprints, Inc." It bears the notation, "Donation."

check drawn on the RW & BSB Account. No disbursements were made from the Account without a receipt.

According to Carter, there were only three disbursements from the RW & BSB Account. One was made on September 14, 2001, for $315, after appellant presented a receipt from Home Depot for the purchase of 60 hard hats. The second check, made payable to appellant, was for $57.80, after appellant presented a receipt for the purchase of a U.S. flag. The third check, in the total amount of $726, was based on several receipts presented by appellant. Thus, the total disbursement amounted to $1,098.80.[3] Carter had no knowledge of what the objects purchased would be used for, other than what appellant told her.

Carter testified:

That's a lot of receipts that were added together. The first one was for the Exxon, for Tiger Mart, for gas, that he [appellant] had been using to ride around to get donations, for 35 dollars. There is another one for fuel at the Mini Market for 20.

\* \* \*

[One was] on 9/14. 9/21. Another gas for 7.80 on, yeah, 9.80, 9/21. The Home Depot for wood on, that was on 9/13 for 146.48. The Home Depot for fasteners, bolts, for 183.99.

\* \* \*

And fuel on 9/19 for 40 dollars. Then the Home Depot for 58.45, and that was for, it looks like some kind of, I'm not sure what that is. A bolt maybe, something, I'm not sure what that was. Some kind of equipment or something. And then I've got another one here to the K–Mart that he

---

3. We cannot explain the one dollar discrepancy in regard to Carter's recitation of the three disbursements, totaling $1,098.80, and the testimony as to the Hebron Bank records showing $3,272.87 deposited to the Account and $2,175.07 left in the Account, i.e., disbursements totaling $1,097.80. However, appellant has not raised any claim of error based on the discrepancy.

had gotten drinks for people that were working out there, 19 dollars. The Home Depot for 92.35, and that was for lumber to build beds in a truck body, I believe. 51.04 for diesel fuel. And foam and plywood on this one here at the Home Depot and that was for 71.95. It was for beds to go in the trailer. And that total should total ... 726 dollars.

According to Carter, appellant never made a "transfer" of funds from his personal account or from CCI's account to the RW & BSB Account. All deposits to the Account were made by personal checks, except for one that was in the form of a cashier's check. The bank did not accept cash contributions, so any cash was exchanged for a cashier's check.

From July to September of 2001, Buffy Brittingham worked as a secretary at CCI, a sole proprietorship owned by Cain. Brittingham recalled that donations for the relief effort were received at CCI's business office; people either "dropped off" checks or mailed them in. According to Brittingham, the checks were made payable to appellant or CCI and "were handed over" to appellant. In addition, approximately $300 in cash was received at the office as a donation for the relief effort. Brittingham recalled: "A mother and some children brought in a bottle-type thing full of change, money that they had collected. ... It was counted and left in the office for [appellant]." Brittingham did not know what happened to the cash. She claimed, however, that she had no dealings with the RW & BSB Account at Hebron Savings Bank.

Further, Brittingham stated that appellant's business account was kept at Peninsula Bank and that appellant was the only one authorized to sign checks on that account. She maintained that she had no control over the business account, nor did she handle deposits for that account.

Brittingham was questioned about the endorsements on the backs of the checks issued by Campbell, Hudson, and Thorp. When asked if she recognized the signatures, Brittingham testified that although she was "not positive," the signatures "look like ... Marty Cain's." And, upon viewing the deposit slips, Brittingham stated that the handwriting on one "resem-

bles Marty's." However, she was unable to identify the handwriting on a second deposit slip.

The witness was also asked about the receipts obtained during the relief efforts. She explained:

> Sometimes we had volunteers who would go to different places or schools that had had some sort of fund raiser, they would use their own vehicles to go and pick up the donations, bring them back, and if they had to fill up with gas or something like that, Marty would reimburse them. Or if we had volunteers out, outside organizing the trailers [4], Marty would get them sodas and things like that for them.

According to Brittingham, some individuals or entities donated items, rather than money. These included socks, t-shirts, toothpaste, razor blades, hard hats, water, canned goods, and a computer.

Brittingham left CCI in late September of 2001, because CCI was experiencing financial problems. Brittingham took a computer when she left CCI. She explained that she did not see appellant during her last week of employment, but CCI's sales manager, Bill Bellfield, told her that appellant had indicated that she "could have one of the computers in the office...." [5] She recalled that the computer was sitting, "all taken apart," on appellant's desk, and she believed it was an office computer, not the one that had been donated. Brittingham also testified that Bellfield gave her permission to take two pagers that had been donated to the relief effort. Further, she acknowledged that he allowed other employees to "take donated items from the storage trailers."

Brittingham maintained that she was given the computer in lieu of part of her pay. Moreover, she claimed that she did not learn until after she left CCI that the computer she took was the one that had been donated by Rent–A–Center. Bellfield contacted her at her new job and told her that she had to

---

4. Brittingham recalled that the trailers at the office site were used for storage and that bunk beds were never built inside the trailers.

5. The State called Bellfield to the stand, but he did not respond.

return the computer. Instead, she contacted the donor of the computer and paid for it. Brittingham acknowledged that, after appellant discovered that she had taken the computer, he called her "a thief."

Trooper Tracy Ilczuk of the Maryland State Police subpoenaed the records for appellant's business account at Peninsula Bank. Upon reviewing the records from September 12, 2001, through December 2001, the trooper determined that the checks from Hudson, Campbell, Thorp, Saunders Roofing, and Cooper had been deposited to CCI's account, totaling $770. In particular, the Campbell and Cooper checks, totaling $120, were deposited to CCI's account on or about September 14, 2001.[6] A second deposit was made on September 20, 2001, in the amount of $650, consisting of the checks of Saunders Roofing, Thorpe, and Hudson.

The bank records also indicated that only appellant was permitted to sign checks on the account. During the period of September 12, 2001, through December of 2001, no checks drawn on the Peninsula Bank account were made payable to the RW & BSB Account. In addition, there were no transfers of any kind from appellant's personal accounts or business accounts to the RW & BSB Account.

Defense counsel conceded that donated money had been deposited in appellant's business account. During cross-examination of the trooper, the following occurred:

> [DEFENSE COUNSEL:] I think it's clear from what we see in the bank records that 770 dollars donated by people that should have gone into the Red, White & Blue account ended up in the Peninsula account, okay? No dispute. Did you or any other law enforcement person ever approach Marty Cain and say, hey, we looked at this stuff and 770 belongs in the other account?

---

**6.** The deposit slip is date stamped September 14, 2001. However, the bank statement shows that the deposit was not posted until September 17, 2001.

[TROOPER ILCZUK:]   I attempted to contact Mr. Cain. I was unsuccessful, unable to do so. . . .

Appellant was the sole witness for the defense.   He strenuously denied stealing any money that was donated to the 9/11 relief effort. He also denied ever seeing the cash donation of approximately $300.

Cain testified that CCI was in the business of "concrete imprinting, pouring concrete work, curb and gutter."   Appellant recalled that, when 9/11 happened, he wanted to help, and thought he could use his expertise to "look for survivors and clean up the mess."   Therefore, he set up the RW & BSB Account.   Moreover, he claimed he had previously been involved in charitable work as a volunteer, and made donations of considerable value, such as the construction of a fountain in an area park.

Appellant explained that he "ran all my job sites," and was present every time his employees poured concrete.   He did not, however, handle "the business details" for CCI.   Rather, appellant stated that Brittingham and Bellfield were responsible for handling the bank deposit slips and for making CCI's deposits.   In addition, he stated that Brittingham "handled most of the bill work, paperwork."

Cain agreed that several checks totaling $770 and intended for the RW & BSB Account at Hebron Savings Bank, had been deposited into CCI's account at Peninsula Bank. But, he denied that he was the one who put the funds in the wrong account.   He also denied that he knowingly spent the money. Moreover, Cain claimed that no one ever contacted him to advise that the monies had been deposited into the wrong account.[7]

Further, appellant denied having any control over the RW & BSB Account.   He testified: "Buffy [Brittingham] was asked if she could handle everything [for the RW & BSB

---

7.   On July 8, 2003, Cain's parents wrote a check for $770 to reimburse the RW & BSB Account.   Apparently, as of the time of trial, that check had not been deposited to the Account.

Account], and she agreed to it. So that was all under Buffy. . . . I was out on the job sites." When asked how often he reviewed the bank statements for his business account, appellant responded: "Very seldom." Appellant added: "I hired a staff to handle my finances inside while I ran the job sites, and that's how our company was running. And then I discovered that Buffy [Brittingham] and Bill [Bellfield] were stealing from my business."

Appellant agreed that his signature was on the checks for the business account at Peninsula Bank, but explained: "I would leave signed blank checks in the morning, and that's how most of that was taken care of. And the payroll checks, I might have signed them that Friday evening, but most of the time they were signed in the morning. And they were left blank." When asked to identify the endorsements on the back of the donation checks deposited to CCI's account, he acknowledged that they looked like his signature.

Further, appellant recalled that, in the summer of 2001, he was on pain medication for his back. He took various prescribed medications, including Darvocet, Oxycontin, and Vioxx. Appellant testified: "The Oxycontin, you couldn't remember nothing at all. I had a poor memory."

With respect to the purchase of 50 or 60 hard hats, appellant said: "The hard hats, when we planned on going to New York City, we wanted all construction workers and we wanted to have experienced men up there because it would be a big demolition job." As to the lumber, he added: "All that stuff was used to go up there and stabilize anything, to whatever we needed to build a temporary shelter, to build temporary housing, anything."

Appellant conceded that he never took any of the material to New York City; the material was stored in trailers on the site. However, Cain claimed he attempted to bring the material to New York, explaining: "They just didn't get back with us as far as I know." He insisted: "I didn't steal any money, and I didn't do anything wrong."

In October 2001, appellant realized that the finances for his business were in "chaos." Therefore, he hired a business attorney and filed for bankruptcy.

We shall include additional facts in our discussion.

## DISCUSSION

■ Appellant maintains that the evidence was insufficient to sustain his conviction for felony theft. While he concedes that "[t]he evidence showed that Appellant could have misappropriated the money," he insists that it also showed "that two others at the business had the opportunity to do so." Thus, he contends that his "mere presence" or mere access to the money did not establish his guilt. Although appellant makes no factual argument regarding Bellfield, as to Brittingham he alleges that she had "access to the cash and business records," and "she admitted" that appellant "accused" her of stealing a computer and two pagers donated to the relief effort. Based on his lack of exclusive control as to the finances of CCI, appellant contends that the evidence was not sufficient to support the conviction.

In addition, Cain refers us to the argument presented by defense counsel in the motion for judgment of acquittal. There, his counsel argued that appellant could not be charged with stealing from the RW & BSB Account, because he "would be charged with stealing from himself. He can steal from people who are making donations to a fund, but he can't steal from his own fund. It's not a separate corporation or anything else."

Appellant has failed to preserve his first argument, pertaining to alleged insufficiency of the evidence. At the close of the State's case, in moving for judgment of acquittal, the defense did not argue that the evidence was insufficient because others had access to the stolen funds. And, at the close of all the evidence, the defense merely renewed the earlier motion, without further argument. *See Graham v. State*, 325 Md. 398, 417, 601 A.2d 131 (1992) ("A claim of insufficiency of the evidence is ordinarily not preserved if the claim is not made as

a part of the motion for judgment of acquittal.") (Citations omitted); *Bates & Beharry v. State,* 127 Md.App. 678, 691, 736 A.2d 407 ("A defendant may not argue in the trial court that the evidence was insufficient for one reason, then urge a different reason for the insufficiency on appeal in challenging the denial of a motion for judgment of acquittal."), *cert. denied,* 356 Md. 635, 741 A.2d 1095 (1999).

Even if preserved, the claim lacks merit. We turn to consider appellant's contentions.

"The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith,* 374 Md. 527, 533, 823 A.2d 664 (2003) (citations omitted). "Weighing the credibility of witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder." *State v. Stanley,* 351 Md. 733, 750, 720 A.2d 323 (1998) (citation omitted). In addition, we give " 'due regard to the [fact finder's] finding of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses.' " *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821 (2002) (citations omitted).

Here, CCI's employees had access to the checks and cash donated to the RW & BSB Account, as they were sent to or dropped off at CCI. Nonetheless, the evidence, viewed in the light most favorable to the State, demonstrated that, upon receipt, all checks and cash were turned over to appellant. In addition, the State's evidence demonstrated that appellant handled all deposits for both the RW & BSB Account and his business account, and appellant requested the disbursements from the RW & BSB Account.

Moreover, only Cain's signature was on the business account at Peninsula Bank. Furthermore, the Peninsula Bank records showed that checks from Campbell, Hudson, and Thorp were deposited into appellant's business account. And, it was appellant, not his employees, who stood to gain from the deposits to CCI's account. Brittingham testified that the

signature endorsing those checks "looks like" appellant's. She also stated that the signature on one of the deposit slips "resembles" appellant's. As a result, even though Brittingham had access to the donated checks and cash at issue, the evidence was sufficient to demonstrate that appellant was the one who stole those items.

To be sure, appellant testified that Brittingham and Bellfield handled all the business details for his company. However, the jury was free to discredit his testimony and to accept Brittingham's testimony. *See, e.g., Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991) (recognizing that "the credibility of witnesses" is "always [a] matter[ ] for the jury to determine when it is the trier of facts"). And, a witness's credibility goes to the weight of the evidence, not its sufficiency. *Ruth v. State,* 133 Md.App. 358, 365, 757 A.2d 152, *cert. denied,* 361 Md. 435, 761 A.2d 933 (2000) (citation omitted).

Appellant refers us to *Wilson v. State,* 319 Md. 530, 573 A.2d 831 (1990), to support his contention that his mere access to the donated checks and cash was insufficient to sustain his conviction. His reliance on *Wilson* is misplaced. In that case, the evidence demonstrated that the accused housecleaner had worked in the area from which some jewelry was subsequently found missing, and had access to the closet where the jewelry was seen earlier in the day. Wilson's conviction rested on circumstantial evidence alone. The Court of Appeals reversed Wilson's conviction, because the evidence demonstrated that several family members also had access to the closet where the jewelry had been stored and that other cleaning personnel might have been in the residence on the date in question.

Concluding that, under these circumstances, Wilson's mere presence was insufficient to sustain his conviction, the Court stated, *id.* at 538, 573 A.2d 831:

> There was no other evidence of Wilson's behavior, acts or conduct, that implicated him as the person who stole the rings. In fact, [a family member's] testimony that Wilson was only seen doing his normal duties is evidence that his behavior was consistent with innocence.

Considering the circumstantial evidence adduced in this case, we conclude that it would not permit a rational factfinder to find, beyond a reasonable doubt, that it was inconsistent with any reasonable hypothesis of Wilson's innocence.

In appellant's case, there was far more than his mere access to the checks and cash. As discussed above, all donations of money were given to appellant. The checks were deposited in appellant's business account, for which only he could sign. Moreover, appellant's employees were not motivated by any financial incentive with regard to the deposit of the donations in CCI's account. And, appellant personally sought the withdrawals of money from the RW & BSB Account. Appellant was not convicted based upon his mere access to the donated checks and monies.

■ Next, we consider appellant's argument that he could not be convicted of theft from the RW & BSB Account, because that is akin to stealing from himself. This contention is without merit.

Appellant was convicted of theft under Md.Code, Art. 27, § 342,[8] which provided, in part:

(a) *Obtaining or exerting control.*—A person commits the offense of theft when he willfully or knowingly obtains control which is unauthorized or exerts control which is unauthorized over property of the owner, and:

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing the use, concealment, or abandonment probably will deprive the owner of the property.

---

8. This section was recodified, effective October 1, 2002, at Md.Code (2002), § 7–104 of the Criminal Law Article.

(b) *Obtaining control by deception.*—A person commits the offense of theft when he willfully or knowingly uses deception to obtain and does obtain control over property of the owner, and:

(1) Has the purpose of depriving the owner of the property; or

(2) Willfully or knowingly uses, conceals, or abandons the property in such manner as to deprive the owner of the property; or

(3) Uses, conceals, or abandons the property knowing such use, concealment, or abandonment probably will deprive the owner of the property.

We are guided by *Cicoria v. State*, 332 Md. 21, 629 A.2d 742 (1993). In that case, the Court of Appeals held that an authorized campaign political committee was "a 'person' for purposes of the ownership provision of the theft statute." *Id.* at 31–32, 629 A.2d 742 (footnote omitted).

Cicoria was a county councilman whose "candidacy was promoted" by a campaign political committee, Citizens for Cicoria ("CFC"), which was organized in accordance with Maryland's election laws. *Id.* at 26–27, 629 A.2d 742. He was ultimately convicted of theft and conduct in violation of the election laws.

In one scheme, Cicoria was reimbursed by CFC for a $2,300 loan he purportedly made to the committee; he had never made a loan in that amount. Instead, the money came from small contributions made by various donors, but was not reported, as required by law. *Id.* at 27–28, 629 A.2d 742. In a second scheme, CFC funds were used to purchase a building unit that Cicoria used as his headquarters. Although the loan documents characterized the purchase as a personal investment, CFC paid more than $30,000 toward the purchase price and made some of the mortgage payments. In yet another scheme, contributions to CFC were not deposited in the campaign fund account, as required by the Election Code. Instead, the funds were deposited in the joint personal account Cicoria held with his wife. Finally, payments for campaign

related expenses were also deposited in the Cicorias' personal account.

On appeal, Cicoria alleged that he was either the sole or joint owner with CFC of all campaign contributions, even those made directly to CFC. He argued that he could not be convicted of theft because he could not steal from himself.

In affirming Cicoria's theft conviction, the Court of Appeals began by examining the theft statute:

> The theft statute prescribes five ways in which the crime of theft can be committed. Art. 27, § 342. Only two of them, *id.* at § 342(a) and § 342(b), have relevance to the case *sub judice.* Those sections proscribe the obtention or exertion of unauthorized control, *id.* at § 342(a), or the obtention of control by deception, *id.* at § 342(b), "over the property of the owner," with the intent to deprive the owner of the property. The ultimate use to be made of the property is not an element of the crime.

> An "owner" is defined as

> [a]   person, other than the offender, who has possession of or any other interest in the property involved, even though that interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property.

> *Id.* at § 340(g).[9]   In addition to having possession under the theft statute, the owner must be a person. Although "person" is not a defined term under the theft statute, it is clear that the use of that term does not mean that the owner must be a natural person; for purposes of the theft statute, "person" has been interpreted expansively, as including individuals, corporations, and financial institutions. CFC, a political committee, *i.e.,* two or more persons formed to promote the success of Cicoria's candidacy, art. 33, § 1–

---

9.   Although the definitions relied upon by the Court of Appeals in *Cicoria* were contained in different subsections of Art. 27, § 340 than were in effect at the time of appellant's offense, the definitions were the same.

1(a)(14), is a "person" for purposes of the ownership provision of the theft statute.

Article 27, section 340(f) defines "obtain" to mean, "[i]n relation to property, to bring about a transfer of interest or possession, whether to the offender or to another. . . ." One "exerts control" when he or she "tak[es], carr[ies] away, appropriat[es] to one's own use or sale, conveyance, transfer of title to, interest in, or possession of property." § 340(d). Section 340(i) defines "property of another" as "real or personal property in which a person other than the offender has an interest which the offender does not have authority to defeat or impair, even though the offender himself may have an interest in the property." *See also* Art. 27, § 343(a). These definitions make clear that theft can be committed by effecting a transfer in possession only. A thief may have an interest in the property taken so long as that interest is not, under the circumstances, superior to that of the possessor.

Whether or not a defendant has an interest sufficient to entitle him or her to possession of the property, and, hence, avoid a prosecution for theft, must depend upon the circumstances. In this case, those circumstances include the requirement of those provisions of the Election Code that prescribe how campaign funds are to be collected, kept and disbursed, and allocate responsibility in that regard. Whether the candidate has a right to possess campaign funds must necessarily depend upon whether there has been compliance with those provisions.

*Cicoria,* 332 Md. at 30–33, 629 A.2d 742 (footnotes and some citations omitted).

The Court recognized that the Election Code did not expressly address who was considered to be the owner of campaign contributions. *Cicoria,* 332 Md. at 33, 629 A.2d 742. Nonetheless, the Court explained: "The allocation of functions and duties among the various campaign personnel, thus, regulating the conduct of political campaigns, is most revealing. So too is the removal from the candidate's hands of sole

discretion for campaign funds." *Id.* at 33, 629 A.2d 742 (citations omitted).

The Court went on to note that the election laws require the appointment of a treasurer. In addition, in light of the laws that require all contributions and expenditures to pass through the treasurer; obligate the treasurer to file reports of contributions and expenditures; and require all deposits to be made through the treasurer, the Court reasoned that "it is CFC, rather than the candidate, that has the requisite 'possession ... or ... other interest in the property involved....'" *Id.* at 36, 629 A.2d 742 (quoting Art. 27, § 340(g)).

Additionally, the election laws did not permit surplus funds to be returned to the candidate. *Id.* at 36–37, 629 A.2d 742. Therefore, reasoned the Court, "[f]or purposes of the theft statute, the candidate simply does not have the requisite possessory or other interest in campaign funds to be their owner." *Id.* at 37, 629 A.2d 742.

In appellant's case, although he opened the RW & BSB Account, two signatures, Carter's and appellant's, were required on the checks. The checkbook for the account was held in Hebron Savings Bank at all times. Appellant had to present receipts to Carter for disbursement of funds from the account, and he testified that he had no control over the account. Accordingly, for purposes of the theft statute, appellant was not the "owner" of the RW & BSB Account. It follows that there is no merit to his claim that he was merely taking his own funds.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**