906 A.2d 989

**Marcus Dannon OWENS**

v.

**STATE of Maryland.**

**No. 2397, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 7, 2006.

36

Peter F. Rose (Nancy S. Forster, Public Defender, on brief), for appellant.

Mary Ann Ince (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel HOLLANDER, KENNEY, EYLER, DEBORAH S., JJ.

HOLLANDER, J.

In this case, we must consider, among other things, whether the Circuit Court for Howard County erred in denying a new trial to Marcus Dannon Owens, appellant, after it was discovered that a foreign national sat on the jury that convicted Owens of second-degree depraved heart murder of his two-year old stepson, Kevonte Davis, as well as first degree assault and child abuse.[1] Appellant presents three issues, which we quote:

1. Whether the trial court erred in failing to grant the motion for a new trial.

2. Whether the trial court erred in failing to suppress Appellant's statements to police.

3. Whether the evidence was insufficient to sustain the convictions.

For the reasons set forth below, we shall affirm.

---

1. Appellant was sentenced to consecutive thirty-year sentences for the murder and child abuse convictions; the court merged the assault conviction.

## I. Factual Summary

### A. Trial

The following evidence was adduced at the trial in June 2004.

Kenesha Davis married appellant on July 25, 2003, five days before Kevonte's death on July 30, 2003. The couple lived with Ms. Davis's two children, Dacquan Davis, then four, and Kevonte, as well as the couple's seven-month-old son, Kemari Owens.

In July 2003, Ms. Davis worked weekdays at a warehouse from 7 a.m. until 5:30 p.m.; appellant was unemployed. Appellant and Ms. Davis shared a Honda Civic, so each morning they would bring the children to Yvette Edmunds, a day-care provider, and then appellant would take Ms. Davis to work. At the end of the work day, appellant would pick up the children as well as Ms. Davis. However, the children did not go to Ms. Edmunds on July 30, 2003.

Ms. Davis testified that, on the morning of July 30, 2003, appellant dropped her off at work with the children. At the time, Kevonte "was active and normal. . . ." At around 5 p.m., when appellant arrived to pick up Ms. Davis, she noticed that Kevonte's eyes were closed, he was "foaming at the mouth," his hands were cold, and he was "moaning like he was in pain." She and appellant took Kevonte to Howard County General Hospital (the "Hospital"), where he died.

Lisa Zovko, a patient care technician in the Pediatric Emergency Room of the Hospital, was on duty when Kevonte arrived. Ms. Zovko saw "blood and foam" were coming from Kevonte's mouth, and he was "posturing," a "movement that can be described as arching and your limbs kind of go stiff and bend backwards," reflective of "central nervous system damage." Zovko "started suctioning the blood out of [Kevonte's] mouth, because [she] didn't want [Kevonte's] airway to be compromised any more."

Zovko summoned Doctor Jackson Tsai, who then rushed Kevonte to the "code room." While chest compressions were

performed, Zovko noticed "an abrasion, like a rug burn," on Kevonte's chest. Resuscitation efforts were unsuccessful, however. According to Ms. Zovko, both parents were upset by Kevonte's death.

Dr. Tsai treated Kevonte as "a priority one patient." While Dr. Tsai was attempting to resuscitate Kevonte, he observed the victim's chest and noticed "some ecchymosis or bruising . . . right below the ribs." In addition, he saw "some bruising over the right side of [Kevonte's] face . . . around the eyeball," as well as "[t]he liver spleen area." He also reported that the child's "belly was sort of distended."

According to Dr. Tsai, appellant did not provide a history as to the source of trauma that would explain the child's injuries. Dr. Tsai noted that the "history" provided by appellant was that Kevonte was eating "peanut butter that afternoon" and that "[t]here was no history of trauma. No history of fall. Or a thud that, that was heard by [appellant]. No history of ingestions."

Dr. David Monroe, the Director of the Hospital's pediatric emergency room, recalled that Kevonte was "bleeding from his mouth," had "a very large bruise on his upper abdomen, lower chest," and bruising on his face and the upper back. Dr. Monroe spoke with appellant to obtain a medical history for Kevonte. Owens told Dr. Monroe that he thought "everything was fine until somewhere between four and four thirty." In Dr. Monroe's view, appellant's "story didn't match at all what we saw in the room. I mean, something, some serious trauma had happened to this child. The story I was given right then was nothing happened."

According to Dr. Monroe, the "massive injuries" suffered by Kevonte were similar to those of "someone that fell off a building, several stories. . . . Or a very serious car accident. Or child abuse." Dr. Monroe also testified that the low oxygen level in the child's blood tended to establish that Kevonte had bled to death. Dr. Monroe acknowledged that chest compressions performed on a person with an existing

break to the ribs could "aggravate the problem to some extent."

Lavanda Pope, Kevonte's great aunt, responded to the Hospital and thought that appellant seemed "agitated." When appellant saw Ms. Pope, he said: " 'They're trying to accuse me of killing Kevonte.' " At the time of that remark, the "detectives were standing behind" him. Ms. Pope told appellant "that the officers were doing their job and at this point he needed to let them do his (inaudible) job, because Kenesha is dealing with the fact that her son is dead." Ms. Pope also saw Kevonte's body, and noticed "a bruise on his face" as well as a "big bruise in the middle of his chest."

Detective Joseph King secured appellant's residence "until a search warrant could be completed." During the execution of the search warrant, he found that the home's telephone was in working order.

Sergeant William Porter was also involved in the search of appellant's home. During the search, he found soiled toddler pants, a soiled diaper in the bathroom, and a soiled wet washcloth in the sink.

Michael DeVilbis, a maintenance employee at Genco at the time of Kevonte's death, testified that he saw appellant pick up Ms. Davis on the evening in question. Mr. DeVilbis heard appellant tell Ms. Davis that " 'he been [sic] shaking the kids all day and couldn't get 'em up' "

Yvette Edmunds, the children's day-care provider, recalled that appellant called her late on the morning in question, and advised that the children were coming. However, the children never arrived, nor did she hear from appellant again.

Detective Eric Kruhm responded to the Hospital and viewed Kevonte's body, which was bruised on the face and chest. Kruhm first encountered Owens with Dacquan in the playroom of the pediatric ward. At that time, Kruhm and Detective Shaffer had a "conversation" with appellant, who responded "freely" to their questions. Detective Kruhm recounted:

[E]arly that morning, [appellant] had a job prospect that he went to. And that they sent him home.... He said he called the babysitter and told her that he would be bringing the children that day. He said he got home. They had breakfast. That his child ... had diarrhea that day and that he didn't have what he needed for the kids for day-care. So he ended up not taking them that day.... That ... the boys, who would be Dacquan and the victim, played that day. They rode bikes. They watched television. He said that around noontime, they had lunch, all of them. And that the boys went back to the living room to watch TV. He went upstairs to give his son a bottle. And he said that Dacquan and the victim had fallen asleep in front of the television. He said that close to five o'clock ... he had to wake the boys up. They were still asleep. He said that the victim was very fussy.... So he let him lay there. And then he came back and he said he wasn't acting right. And that he was falling back asleep.... So he got the kids in the car. He went to his wife's job in Columbia and picked her up. And ... he said that the victim was dozing off in the car.

Detective Kruhm asked appellant how Kevonte sustained his bruising. According to Detective Kruhm, appellant advised that

it was probably from fighting with his brother Dacquan or that it might have happened at day care. But first he said he wasn't sure.... He said that he was the only one with the children that day. He had watched them from the time he got back from dropping his wife until the time he went to pick her up. He said that no one visited the home. He said that they didn't leave the home.

Detective Kruhm also testified: "At one point, [appellant] backed his head against the wall and he said, quote, 'Fucking up.' And then at another point in the conversation, between questions he said, 'How does this shit happen?' "

At approximately 9:45 p.m., Detective Kruhm had a second "conversation" with appellant at the Hospital, which was re-

corded by audiotape. The interview was played for the jury and a transcription was admitted in evidence. In the statement, appellant denied responsibility for Kevonte's death.

Doctor Zabiullah Ali, an Assistant Medical Examiner, performed the autopsy on Kevonte. He was admitted, without objection, as an expert "in the field of forensic pathology." During the autopsy, Dr. Ali observed bruising to the victim's right temple, left lip, head, and lower chest/upper abdomen. In addition, Kevonte had four fractured ribs and two injuries to his liver. The doctor opined that the cause of the injury to the ribs and liver was blunt force to the abdomen/chest, which then caused internal bleeding. Kevonte also had "bruising of . . . both lungs [and the] thymus. . . ."

According to Dr. Ali, a small child could not have inflicted the injuries sustained by Kevonte. He claimed that "we usually observe these kinds of injuries in motor vehicle accidents." Dr. Ali also stated that, because of Kevonte's rib fractures, he would not have been able to put his shirt on by himself.

Dr. Ali opined "that the cause of death was multiple blunt force trauma," inflicted less than four to six hours before death. Dr. Ali also concluded that "[t]he manner of death was homicide."

Appellant was the sole witness for the defense. He recalled that he was with the children from approximately 7:30 a.m. on July 30, 2003, until he drove with the children to pick up his wife at approximately 5:00 p.m. Appellant explained that he fed the children lunch, but Kevonte "just play[ed] with his." After lunch, Owens left the children downstairs watching TV, while he took care of the baby upstairs. The following exchange is relevant:

[APPELLANT'S COUNSEL]: And so you're upstairs with the baby lying on your chest?

[APPELLANT]: On top of me.

[APPELLANT'S COUNSEL]: And what occurred at that point?

[APPELLANT]: I heard them, I guess they, they may have got into something or whatever. I just yelled downstairs and told them to cut it out or I was going to cut the TV off.

[APPELLANT'S COUNSEL]: Okay. And what do you mean they got into something?

[APPELLANT]: I believe it was like a little, a little fight or argument or something, it was a truck or something.

[APPELLANT'S COUNSEL]: Okay. And is this unusual?

[APPELLANT]: No.

\* \* \*

[APPELLANT'S COUNSEL]: Okay. And so after that, what did you hear from downstairs?

[APPELLANT]: Nothing.

[APPELLANT'S COUNSEL]: All right. And so what did you do upstairs?

\* \* \*

[APPELLANT]: I just laid on the floor . . . and . . . I just fell asleep.

[APPELLANT'S COUNSEL]: And at some point you woke up. Do you remember what woke you up?

[APPELLANT]: I heard a truck like backfire like the next parking lot over or something.

\* \* \*

[APPELLANT'S COUNSEL]: Okay. And you went downstairs because?

[APPELLANT]: Because I'd fallen asleep.

[APPELLANT'S COUNSEL]: And? Anything else?

[APPELLANT]: Just, uh, it just dawned on me to go check on them because I feel [sic] asleep. . . .

[APPELLANT'S COUNSEL]: Okay. And so what happened after that?

[APPELLANT'S COUNSEL]: Daquan was by the TV. Kevonte, he was back a little ways from Daquan, like over by the sliding door, glass door, balcony door.

50

[APPELLANT'S COUNSEL]: And is that where he was the last time you had been downstairs?

[APPELLANT]: No, it wasn't.

[APPELLANT'S COUNSEL]: At that point, what were they both doing?

[APPELLANT]: Daquan was up. Kevonte was asleep.

According to appellant, after checking on the boys, he went back upstairs, gave the baby a bottle, and prepared to pick up his wife. The following testimony is relevant:

[APPELLANT'S COUNSEL]: And when you talk about gathering things, what are you gathering? What are you putting together?

[APPELLANT]: Like extra bottle and looking for clothes and stuff like that. Tee shirts or whatever.

\*　　\*　　\*

[APPELLANT'S COUNSEL]: All right. And what was, what were the kids doing?

[APPELLANT]: Kevonte was still laying down and Daquan was like, he was like on his knees, I believe, looking at TV.

\*　　\*　　\*

[APPELLANT'S COUNSEL]: Okay. And what did you do then?

\*　　\*　　\*

[APPELLANT]: And I believe I gave Daquan some shoes. Or something. And I had a shirt for Kevonte with me.

[APPELLANT'S COUNSEL]: Okay. What did you do with that shirt?

[APPELLANT]: I woke him up and told him to put his shirt on, because it was almost time to go pick Mommy up.

[APPELLANT'S COUNSEL]: Okay. And what happened next?

[APPELLANT]: He got up and was like proceeding to put his shirt on. I went in the kitchen for something and went back upstairs.

[APPELLANT'S COUNSEL]: Okay. And did you come back downstairs?

[APPELLANT]: Yeah.

[APPELLANT'S COUNSEL]: Did Kevonte have his shirt on?

[APPELLANT]: Partially.

[APPELLANT'S COUNSEL]: Okay. What do you mean by that?

[APPELLANT]: He like had his, had his arm in it and like hanging on his shoulder like by his neck.

[APPELLANT'S COUNSEL]: So like one arm through the sleeve?

[APPELLANT]: Yeah.

* * *

[APPELLANT'S COUNSEL]: Okay. And what happened with Kevonte after that?

[APPELLANT]: *He sat up, put his shirt on,* laid back down. Like groggy. Like still sleepy like.

[APPELLANT'S COUNSEL]: Did you notice any kind of bruising on Kevonte?

[APPELLANT]: I noticed like maybe a little scratch or something on his face. Something like, like they might have been fighting or something like that or—something.

[APPELLANT'S COUNSEL]: Did you see anything on his chest area?

[APPELLANT]: I didn't notice anything.

(Emphasis added.)

## B. Post–Trial

The jury returned its verdict on June 10, 2004. That evening, Steven Merson, the Howard County Jury Commissioner, received a voice-mail message from Juror 10, Adeyemi Alade, a twenty-eight year old Nigerian national. Alade expressed concern about his jury service because he was not a United States citizen.[2]

---

2. We have no knowledge as to Alade's current immigration status.

The court decided to hold a hearing on June 18, 2004, to discuss the matter. At the outset of the hearing, the court said: "And we're here today, really at my request, I guess, since there is no pending motion, to just inquire as to the nature and content of a phone call received by our jury commissioner after the trial was concluded."

Mr. Merson testified about the telephone message he received from Mr. Alade on June 10, 2004. According to Merson, Alade related that he was "worried about his status, or the status of the case, since he was a non-citizen."

According to Mr. Merson, potential jurors are mailed a juror qualification form several weeks before they are scheduled to report, which they are to fill out and return to the court. He identified Mr. Alade's juror qualification form. Part B of the form provides:

**QUALIFIED:**

—— I am qualified to serve as a juror and will report as instructed.

—— I am qualified to serve as a juror and will need an accommodation (i.e., sign language interpreter, etc.)

**DISQUALIFIED: I AM NOT QUALIFIED TO SERVE AS A JUROR BECAUSE**

—— I am no longer a resident of Howard County. My new address is:

—— I am not a citizen of the United States. I am a citizen of

—— I do not have sufficient knowledge of the English language to act as a juror.

—— I have been convicted of a criminal offense and received a fine of more than $500 or a sentence of more than (6) six months, and have not been pardoned.

—— I have pending charges against me punishable by a fine of more than $500 or a sentence of more than (6) six months.

—— I have a civil case pending in Howard County, (except for civil actions in which a party is not entitled to a jury trial.)

—— I have a physical or mental infirmity that would impair my capacity to serve as a juror. (Please attach letter explanation).

Merson explained that Mr. Alade checked the box indicating that he was qualified to serve as a juror. Further, he testified that it is not the practice of his office to review the information supplied on the form at the time jurors appear for service, unless it appears that some information is missing. Merson acknowledged that the film shown to jurors upon arrival for service does not include information regarding qualifications for service as a juror.

Mr. Alade testified that Nigeria is his "country of origin," and he is not a United States citizen. As a graduate student in the United States, he is "a permanent resident," and may remain in this country as long as he is "working, serving [in] the military, [or] go[ing] to school." At the time of the hearing, Alade had been in the United States for two years. He holds a valid Maryland driver's license, which lists his Howard County address.

Alade related that he contacted Mr. Merson after a colleague at school informed him that only United States citizens are allowed to serve on juries. Mr. Alade confirmed that he received in the mail the juror qualification form, and checked the space indicating that he was "qualified" to serve. He explained that he "just missed" the portion of the form regarding categories for disqualification, but "[i]t wasn't deliberate." He added: "Maybe I just [flipped] through [the form] and didn't see that." To the best of Alade's recollection, when he reported for jury duty nobody sought to verify his citizenship. Nor was he asked about his citizenship at any time during the course of the trial.

At the end of the hearing the court stated: "Okay. I guess that's all that is before me today, is just to make the inquiry,

and there's nothing pending, so with that, I guess we'll conclude for today."

On the same day as the hearing, appellant filed a "Motion for a New Trial," pursuant to Maryland Rule 4-331.[3] He argued that his "trial was not conducted before a lawful jury," because the "jury contained a juror who was not qualified for jury service in that he was not a citizen of the United States and [he] was not qualified to vote in the county where the trial took place."

In its opposition to the motion, the State asserted:

1. The Defendant was afforded a trial before a fair and impartial jury as is required by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights.

2. A non-citizen was inadvertently seated on the Defendant's petit jury. The participation of a non-citizen on the jury does not render the verdict null and void.

3. Citizenship is a Maryland statutory requirement for juror eligibility. Courts and Judicial Proceedings Article, Section 8-207; *Hunt v. Maryland*, 345 Md. 122, 691 A.2d 1255 (1997). Neither the United States Constitution nor the Maryland Declaration of Rights requires that a jury be comprised only of citizens. Instead, the Defendant is constitutionally guaranteed a right to a fair and impartial trial jury which he was in fact afforded.

4. The Defendant waived any challenge to the statutory eligibility of the jurors by not challenging the array pursuant to Courts and Judicial Proceedings, Section 8-211. *Hunt v. Maryland*, 345 Md. 122, 143-144, 691 A.2d 1255 (1997). The Defendant further waived any challenge to the statutory disqualification of the non-citizen juror by failing to request a voir dire question regarding the statutory requirement of juror eligibility. *Hunt*, 345 Md. at 144, 691 A.2d 1255. The non-citizen juror did not indicate bias or prejudice by answering any of the voir dire questions posit-

---

3. Presumably, the motion was filed after the hearing.

ed by the Court as requested by the Defendant and the State. He was, therefore, a fair and impartial juror.

5. The jury in this case unanimously reached a fair verdict after deliberating for four (4) hours.

6. The evidence fully supported the verdict rendered by the jury.

7. The interests of justice require that this Court deny the Defendant's Motion. The Defendant has not cited any authority in his motion justifying the extraordinary relief he seeks.

On July 16, 2004, the court held a hearing as to appellant's motion for new trial. Appellant's counsel maintained that United States citizenship is a requirement for service on a Maryland jury. Further, he argued:

The [Courts and Judicial Proceedings Article] contains a list of various types of disqualifications, which run from ... not being physically strong, or not being able to hear well, to having a pending misdemeanor charge or a pending civil case that would entitle one to a jury. I would suggest to the Court that ... not all these disqualifications are created equal. And I would suggest to the Court that non-citizenship is a disqualification that takes on different significance than perhaps the other disqualifications that are listed in the statute.

Defense counsel continued:

At this time in history, when our nation is at war with foreign nationals who would seek the destruction of our institutions and way of life in this country, I think that we have to look particularly at the question of non-citizenship and view it in a way different than perhaps some of these other disqualifications may be viewed.... And I think, Your Honor, that in that situation, the factors that were mentioned in *Perkins v. Smith* [370 F.Supp. 134 (D.Md.1974), *aff'd*, 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976),] ... affirmed by the Supreme Court ... talks about ... citizenship as a requirement for jury service and the importance of citizenship as a requirement for jury service, when

they mention that the State can presume its citizens are conversant with the social and political institutions of our society, the customs of the locality, the nuances of local tradition and language, and naturalized citizens have at least demonstrated a basic understanding of our form of government, history and traditions, there is no corresponding basis for assuming that resident aliens have that same shared, national mores that is essential in reaching the determinations which, in the jury system, as *Perkins v. Smith* says, is the very palladium of a free government.

* * *

So my limited request, and the limited rule for which I advocate, is that when the disqualification is non-citizenship and when it comes to light prior to the entry of judgment, during that ten day period when the Court had broad discretion to grant a motion for a new trial, I would say in that limited circumstance, it would be an abuse of the Court's discretion not to grant the motion for a new trial. . . .

The State countered that neither the United States Constitution nor the Maryland Declaration of Rights requires citizenship of Maryland jurors. Further, it maintained that appellant waived his claim, because he failed to request a voir dire question regarding juror eligibility. Moreover, the State asserted that no prejudice to the accused was shown. It argued:

> Your Honor, this was a case that was heard before a jury of twelve. It was a jury selected after several hours. . . . At no time, Your Honor, was there a challenge to the array, suggesting at all that the jury was not eligible or qualified or had been chosen in a manner contrary to the provisions of the Courts Article which governs jury selection and service. Your Honor, the legislature of Maryland has spoken in terms of what it is that is to be acceptable as a juror. If the Court looks to the . . . statute that governs qualifications of a juror, you will see, Your Honor, language that is inclusive rather than exclusive. The legislature has very

limited situations in which they deem a person to be disqualified to serve, one of which the State accedes is in fact citizenship, because you have to ... be able to be registered to vote in the county.... What we find ourselves in, at least in this county and particularly in this case, is that we have now extended from the voter registration rolls to include the motor vehicle rolls for selection of jurors, as is acceptable under the jury plan that was selected for Howard County and acceptable under the Courts Article. The hope being that you would garner more diversity, more jurors that may be eligible for service. Again, more inclusive rather than exclusive.... The legislature has spoken in this particular state and has made it a statutory disqualification to have citizenship be a requirement for service on a jury. *There is nothing in the United States Constitution itself or the Maryland Declaration of Rights which creates a constitutional right of a jury comprised solely of United States citizens.*

\* \* \*

Here in this case, Your Honor, we had multiple questions being asked of the prospective jurors regarding bias.... Here, the defense chose not to ask any other questions regarding statutory disqualifications. The Court in fact went beyond what was asked ... by the attorneys in this case.... The Court asked regarding pending of a civil suit. That was contained neither in the defense voir dire or the State's voir dire. To determine whether or not there was a disqualifying factor in that particular case.

(Emphasis added.)

The State continued:

Your Honor, we're in, we are at war. There is no question. But we're not at war with Nigeria, which is the citizenship of Mr. Alade. And I suggest to the Court that ... flag-waving here is somewhat inappropriate in this particular case, because there is no suggestion that Mr. Alade is anything but honest, anything but honorable. When he found out that in fact there may be a problem with his

having served on this jury, he immediately contacted the jury commissioner, Mr. Merson. Left a message that Thursday night following the verdict. He came in to the court, gave testimony that was very clear this was simply a situation in which the line regarding citizenship was overlooked. This was not an intentional misapplication of, or an intentional lie or something untoward for him to be able to sit on this jury.

\*　　\*　　\*

We have before us, Your Honor, a situation where if the Court were to grant this motion for new trial, we've had already three days of testimony. We have had twelve jurors sitting in a box. All the courtroom personnel, all the attorneys involved here. . . . The reason that there are strict guidelines set forth in the statute for challenging the qualifications of a juror, is because there is a greater interest in having some finality, Your Honor, in this system. And absent any showing of bias or prejudice, which has not even been close to being shown in this case. . . . [T]o grant a new trial sets a precedent. And a precedent that I suggest the Court would open Pandora's box, because it would be used by others to look at juror's personal lives. . . . And in the interest of justice, the State suggests this verdict should stand.

In a well reasoned opinion issued on July 21, 2003, the court denied appellant's motion. The trial court recognized that, under Md. Rule 4–331, it had the discretionary authority to order a new trial in the interest of justice. The court also recognized that Maryland Code (1973, 2002 Repl.Vol.), § 8–207(b) of the Courts and Judicial Proceedings Article ("C.J.") "enumerates nine (9) grounds for disqualification of jurors," and "one such ground" is "[n]ot being constitutionally qualified to vote in the county where the court convenes. . . ." But, the court concluded that neither the United States Constitution nor the Maryland Declaration of Rights "mandates that a jury be comprised solely of United States' [sic] citizens." It stated:

The Defendant asserts that the disqualifying factor of Mr. Alade's non-citizenship could not reasonably have been discovered during the *voir dire* examination of potential jurors. The basis for the Defendant's proposition is his contention that the court is not required to ask proposed *voir dire* questions disclosing potential statutory disqualification since it is presumed that the court has already screened and removed disqualified persons prior to the commencement of *voir dire*. The Defendant additionally contends that the court need not have asked any questions about citizenship in *voir dire* had the Defendant proposed them.

The fallacy of the Defendant's argument is that neither the State nor the defense requested a *voir dire* question directed to the issue of citizenship. Had such a question been requested, the court would in all likelihood have made the inquiry (as it did *sua sponte* regarding the issue of pending jury trials) and Mr. Alade would have been excused as a disqualified juror. Contrary to the Defendant's assertions, a reasonable opportunity existed to challenge Mr. Alade's qualifications to serve as a juror during the *voir dire* questioning of potential jurors. The Defendant did not avail himself of this opportunity.

* * *

The Court notes that Mr. Alade responded appropriately to all questions posed to him by the Court and/or counsel during the evidentiary hearing. Based upon this fact, it would appear that Mr. Alade has no difficulty understanding or conversing in the English language. The jurors deliberated for approximately four (4) hours. The jurors did not send out any questions during the course of their deliberations which suggests that the jurors (including Mr. Alade) had no difficulty understanding the evidence or the instructions of law in reaching their unanimous verdicts. In addition, there has been no showing that Mr. Alade's non-citizen status in any way or manner prejudiced the Defendant's case, his consideration of the evidence, or the jury's deliberations.

Testimony adduced from Mr. Alade at the evidentiary hearing established that his failure to note that he was not a citizen of the United States was simply an oversight. He testified that he overlooked the line asking this question on the juror qualification questionnaire. The Court finds Mr. Alade's testimony in this regard to be credible. The Court further finds that Mr. Alade did not provide a dishonest response to the citizenship question. The Court notes that the questionnaire itself is confusing. As reflected on Court's Exhibit A, a person can "check off" that he or she is qualified to serve as a juror before even seeing the disqualifying factors listed below.

There was no evidence presented in the case *sub judice* to suggest that the presence of Mr. Alade on the jury in any way denied the Defendant a fair and impartial trial or violated his due process rights. The mere presence and participation of a juror who would have been disqualified by statutory provisions is not a basis for a new trial absent a showing of bias or prejudice. The Defendant has failed to make such a showing. The Court will accordingly deny the Defendant's Motion for New Trial.

We shall include additional facts in our discussion.

## II. Discussion

### A. Juror Disqualification

Owens insists that, in order to be qualified for jury service in Maryland, "one must be a United States citizen and a citizen of the State...." Because "Mr. Alade was not registered to vote in Howard County-and, indeed, was a noncitizen," appellant contends that Alade was "neither constitutionally *nor* statutorily qualified to sit as a juror in the instant case." According to appellant, he was "effectively left [with] a jury of eleven, violating Maryland Rule 4-311 ... and the constitutional requirement of unanimity of twelve jurors in order to convict in a criminal case...." Therefore, he claims that the circuit court erred in denying his motion for a new trial.

In support of his claim that he was entitled to a jury composed of twelve citizens of the United States, Owens relies on the Sixth Amendment of United States Constitution, Articles 5, 21, 23, and 24 of the Maryland Declaration of Rights, as well as the common law. He asserts:

[U]nder the English common law, while not entirely sufficient, it was at least *necessary* that jurors be drawn from the county in which the "fact (crime) was committed." . . . It goes without saying, then that *citizenship* was a prerequisite for jury service under the common law of England [ ]; and so it goes without saying that such is the case under the explicit terms of Article 5 of the Constitution of Maryland and its incorporation of then existing English common law.

(Citations omitted; emphasis in original).

Urging us to reverse his convictions, Owens adds:

Appellant respectfully suggests that owing to the unprecedented historical and political circumstances in which we find our country and the several United States—that we are, indeed, at war with [an] enemy which is comprised, at the very least, of an unspecified number and variety of foreign nationals who likely move about freely among us as yet undetected-that this Court should interpret the "impartial jury" requirement under the federal constitution, Sixth Amendment, the due process clause of the Fifth Amendment, and the due process and equal protection clauses of the Fourteenth Amendment, to mean that in any trial by jury in a criminal case, all of the jurors be United State's [sic] *citizens.*

(Emphasis in original).

Although the State agrees that "[t]he right to trial by jury is a fundamental right, guaranteed by the Sixth Amendment to the United States Constitution, and by the Maryland Declaration of Rights," it contends that the trial court did not err in denying appellant's motion for a new trial. It maintains: "Contrary to Owens's contention, and as the trial court correctly held, '[n]either the United States Constitution nor the Maryland Declaration of Rights mandates that a jury be

comprised solely of United States' citizens.' " (Citation omitted).

According to the State, the trial court correctly concluded that "there has been no showing that Mr. Alade's non-citizen status in any way or manner prejudiced [Owens's] case, his consideration of the evidence, or the jury's deliberation." Thus, it maintains that Mr. Alade's inclusion on the jury "did not infringe on Owens's due process right to a fair and impartial jury" of twelve persons.

Furthermore, the State agrees with the trial court that "Owens had a reasonable opportunity to challenge Mr. Alade's qualifications to serve as a juror during the voir dire process," but did not avail himself of the opportunity. Disputing appellant's contention that "voir dire was not adequate," the State reminds us that "the trial court found that no questions were requested directed to the issue of citizenship and that '[h]ad such a question been requested, the court would in all likelihood have made the inquiry. . . .' " Thus, it contends that the trial court properly concluded that "Owens waived his complaint to the presence of the non-citizen juror and, because, Owens failed to make a showing of bias or prejudice, Owens stated no grounds warranting a new trial."

We begin our analysis with a review of the right to a trial by jury in a criminal case.

█ The right of a criminally accused person to trial by an impartial jury is guaranteed by the Sixth Amendment of the United States Constitution,[4] made applicable to the states through the due process clause of the Fourteenth Amendment,

---

4. The Sixth Amendment provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

as well as Articles 5,[5] 21,[6] and 24 [7] of the Maryland Declaration of Rights. Maryland Rule 4–311 is also pertinent. It provides, in part:

## Rule 4–311. Trial by jury.

(a) **Right preserved.** The right of trial by jury as guaranteed by the Maryland Constitution and the Maryland

---

5. Article 5 of the Maryland Declaration of Rights provides:
 **Article 5.** **Common Law and statutes of England applicable; trial by jury; property derived under charter granted to Lord Baltimore.**
 (a) That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity; and also of all Acts of Assembly in force on the first day of June, eighteen hundred and sixty-seven; except such as may have since expired, or may be inconsistent with the provisions of this Constitution; subject, nevertheless, to the revision of, and amendment or repeal by, the Legislature of this State. And the Inhabitants of Maryland are also entitled to all property derived to them from, or under the Charter granted by His Majesty Charles the First to Caecilius Calvert, Baron of Baltimore.
 (b) The parties to any civil proceeding in which the right to a jury trial is preserved are entitled to a trial by jury of at least 6 jurors.
 (c) That notwithstanding the Common Law of England, nothing in this Constitution prohibits trial by jury of less than 12 jurors in any civil proceeding in which the right to a jury trial is preserved.

6. Article 21 of the Maryland Declaration of Rights states:
 **Article 21.** **Rights of accused; indictment; counsel; confrontation; speedy trial; impartial and unanimous jury.**
 That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty.

7. Article 24 of the Md. Declaration of Rights states:
 **Article 24.** **Due process.**
 That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Declaration of Rights or as provided by law shall be preserved to the parties in circuit court inviolate.

(b) **Number of jurors.** A jury shall consist of 12 persons unless the parties stipulate at any time in writing or on the record that the jury shall consist of any number less than 12.

In *Stokes v. State,* 379 Md. 618, 843 A.2d 64 (2004), the Court of Appeals reiterated that "[t]he right to a trial by jury, of twelve persons, has been part of the common law for centuries, along with the requirement of unanimity. The right to trial by jury is guaranteed by the Maryland Declaration of Rights and the Maryland Rules, as well as the United States Constitution." *Id.* at 625–26, 843 A.2d 64 (citing *Kawamura v. State,* 299 Md. 276, 473 A.2d 438 (1984)). In reviewing the right to a jury trial, the Court said, *id.* at 626, 843 A.2d 64 (emphasis added):

Article 5 of the Maryland Declaration of Rights provides, in pertinent part, "That the Inhabitants of Maryland are entitled to ... trial by Jury...." Article 21 of the Declaration of Rights provides, in pertinent part, "That in all criminal prosecutions, every man hath a right ... to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty." ... Article 24 of the Declaration of Rights provides, "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges ... or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." *The reference to "jury" in our organic laws, refers to a jury as constituted under the common law, unless the contrary plainly appears. See State v. Kenney,* 327 Md. 354, 361, 609 A.2d 337, 340 (1992); *State v. Ledger,* 175 Wis.2d 116, 499 N.W.2d 198, 202 (Ct.App.1993) (citing *State v. Gollmar,* 32 Wis.2d 406, 145 N.W.2d 670, 671–72 (1966)). *Cf. Bryan v. State Roads Comm'n,* 356 Md. 4, 14, 736 A.2d 1057, 1061 (1999) (holding that the 1992 amendment to Article 5 of the Maryland Declaration of Rights permits a six person jury in all cases except criminal cases); *Thompson v. State,* 278 Md. 41, 53,

359 A.2d 203, 210 (1976) (noting that common law right to a jury trial exists absent a rule or statute taking the right away where it would be constitutionally permissible to do so).

The right to a jury trial is codified in Maryland in Title 8 of the Courts and Judicial Proceedings Article ("C.J.") of the Maryland Code (1974, 2005 Supp.), which governs "Juries." [8] Notably, C.J. § 8–102 provides that jurors shall be randomly chosen from "citizens" of the State. In particular, it provides: [9]

### § 8–102. Declaration of policy.

(a) *Right to jury selected at random.*—When a litigant in a court of the State is entitled to trial by a petit jury and when a person accused of a criminal offense is presented to a grand jury, the **jury shall be selected at random from a fair cross section of the citizens of the State who reside in** the county where the court convenes.

(b) *Opportunity and duty to serve.*—**Every citizen** of this State has:

(1) The opportunity to serve on grand and petit juries; and

(2) The obligation to serve when summoned as a juror.

(Emphasis added.)

Subtitle 2 of Title 8 concerns juror selection. Until December 31, 2000, prospective jurors in Maryland were selected solely "from among those persons at least 18 years old or older whose names appear on the voter registration lists, and from such additional sources permitted by a plan adopted under [C.J.] § 8–201." *See* C.J. § 8–104 (1998 Repl.Vol.).

---

**8.** Effective October 1, 2006, C.J. §§ 8–101 through 8–401 will be repealed by H.B. 1024, 2006 Maryland Laws, Ch. 372. These provisions will be reorganized and recodified. The substantive changes are not pertinent here.

**9.** Effective October 1, 2006, C.J. § 8–102 will be moved to C.J. § 8–102 and C.J. § 8–104.

With respect to the "sources of prospective jurors," C.J. § 8–104 was revised, effective January 1, 2001, to provide, in part:

(a) *Sources*—The jury commissioner or the clerk of the court shall select the names of prospective jurors from among:

(1) Those persons at least 18 years old whose names appear on the voter registration lists;

(2) The list of individuals at least 18 years old who have been issued a driver's license by the Motor Vehicle Administration; [10]

(3) The list of individuals at least 18 years old who have been issued an identification card by the Motor Vehicle Administration; and

(4) *Additional sources permitted by a plan adopted under § 8–201 of this title.*

(Emphasis added.)

C.J. § 8–201 provides that each circuit court shall maintain a "written plan for random selection of ... petit jurors...." [11] C.J. § 8–202(2) requires that each jury selection plan shall "[s]pecify detailed procedures to be followed by the jury commissioner or clerk in selecting names from the voter registration lists, the Motor Vehicle Administration lists ... or from other sources...." [12]

Of particular import here, C.J. § 8–202(5)(i)(1) provides for a "juror qualification form" that asks all potential jurors the following:

---

**10.** Although an applicant for a Maryland driver's license is required to prove a "Maryland residence address," Md.Code (1977, 2006 Repl. Vol.), § 16–106(b)(1) of the Transportation Article ("Transp."), and "any other pertinent information that the Administration requires," Transp. § 16–106(b)(5), a person need not be a U.S. citizen in order to obtain a valid Maryland driver's license. Transp. § 16–103.1

**11.** Effective October 1, 2006, C.J. § 8–201 will be found in C.J. §§ 8–105, 8–201, 8–202, and 8–213.

**12.** Effective October 1, 2006, C.J. § 8–202 will be moved to C.J. §§ 8–105, 8–204, 8–205, 8–206, 8–207, 8–209, 8–212, and 8–302.

1. The potential juror's
 A. Name, address, age, sex and education;
 B. Race, religion, national origin,
 C. Occupation and occupation of spouse;
 D. Length of residence within the county; and
 E. Prior jury service;

In addition, the "juror qualification form" must ask the following, pursuant to C.J. § 8–202(5)(i)(2)–(5):

### § 8–202. Same—Mandatory provisions.

\* \* \*

2. Whether the potential juror should be excused from jury service because the individual has any physical or mental infirmity impairing the individual's capacity to serve as a juror;

3. If the potential juror is able to read, write, speak, and understand the English language;

4. If the potential juror has pending against the individual any charge for the commission of, or has been convicted in any state or federal court of record, of a criminal offense other than a minor traffic offense (i.e., one punishable by a fine of $500 or less or imprisonment for six months or less) and has not been legally pardoned; and

5. Any other questions not inconsistent with the provisions of this title, required by the juror selection plan in the interests of the sound administration of justice.

(ii) The juror shall certify under penalty of perjury that his responses are true to the best of his knowledge. Notarization is not required.

(iii) The form shall make clear to the person that furnishing any information with respect to his race, religion, or national origin is not a prerequisite to his qualifications for jury service, and that his information need not be furnished if the person finds it objectionable to do so.

C.J. § 8–206 provides for the mailing of juror qualification forms to those persons selected at random under C.J. § 8–205,

with instructions to complete the form and return it within ten days. C.J. § 8–206(c) provides: [13]

**§ 8–206. Completion of the juror qualification form; failure to return form; questioning jurors' qualifications.**

\* \* \*

(c) *Judge may question juror about qualifications.*—When a person appears for jury service, or is interviewed by the jury judge, clerk or jury commissioner, the person may be required to fill out another juror qualification form in the presence of the jury commissioner or the clerk of the court, and at that time, if it appears warranted, the person may be questioned, but only about his responses to questions contained on the form and grounds for his excuse or disqualification. The clerk or jury commissioner shall note any additional information thus acquired on the juror qualification form and transmit it to the jury judge.

C.J. § 8–207 is also of import here, as it sets forth the grounds for juror disqualification.[14] It provides, in part:

**§ 8–207. Qualifications for jury service.**

(a) *Determination.*—A person may not be disqualified or excused from jury service except on the basis of information provided by the juror qualification form as it may be supplemented by an interview or other competent evidence. The determination of a prospective juror's qualifications shall be made by the jury judge on his own initiative, or on the recommendation of the clerk or jury commissioner....

(b) *Grounds for disqualification.*—*A person is qualified to serve as a juror unless he:*

(1) *Is not constitutionally qualified to vote in the county where the court convenes;*

---

**13.** Effective October 1, 2006, C.J. § 8–206 will be codified at C.J. §§ 8–206, 8–302, 8–303, 8–304, 8–305, and 8–314.

**14.** Effective October 1, 2006, C.J. § 8–207 will be found in C.J. §§ 8–103, 8–302, and 8–404.

(2) Is unable to read, write, or understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

(3) Is unable to speak the English language or comprehend spoken English;

(4) Is incapable, by reason of physical or mental infirmity, of rendering satisfactory jury service; any person claiming such a disqualification may be required to submit a doctor's certificate as to the nature of the infirmity;

(5) Has a charge pending against him for a crime punishable by a fine of more than $500, or by imprisonment for more than six months, or both, or has been convicted of such a crime and has received a sentence of a fine of more than $500, or of imprisonment for more than six months, or both, and has not been pardoned;

(6) Has a charge pending against him for, or has been convicted of, an offense punishable under the provision of § 8–401(c) of this title;

(7) Is a party in a civil suit, except for those civil actions in which a party is not entitled to a jury trial, pending in the court in which he is called to serve;

(8) Is under 18 years of age; or

(9) Fails to meet any other objective test prescribed by the Court of Appeals.

(Emphasis added).

As noted, C.J. § 8–207(b)(1) does not expressly disqualify those who are not citizens of the United States. Rather, it renders unqualified any person ineligible to vote in the jurisdiction "where the court convenes." Therefore, we must next look to the laws governing voter eligibility. Those laws make clear that only United States citizens are entitled to vote.

Article 1, § 1 of the Maryland Constitution, provides:

Every *citizen* of the United States, of the age of 18 years or upwards, who is a resident of the State as of the time for the closing of registration next preceding the election, *shall*

*be entitled to vote* in the ward or election district in which he resides at all elections to be held in this State.

(Emphasis supplied).

Article 1, § 2 of the Maryland Constitution states, in part: "[N]o person shall vote, at any election, Federal or State, hereafter to be held in this State, or at any municipal election in the City of Baltimore, unless his name appears in the list of registered voters."

Section § 3–102 of the Election Law Article of the Md. Code (2002, 2005 Supp.) also provides that, in order to qualify to vote in Maryland, a person must be a United States citizen.[15] It states:

### § 3–102. Qualifications for voter registration.

(a) *In general.*—Except as provided in subsection (b) of this section, *an individual may become registered to vote if the individual:*

(1) **is a citizen of the United States;**

(2) is at least 18 years old or will be 18 years old on or before the day of the next succeeding general or special election;

(3) is a resident of the county as of the day the individual seeks to register; and

(4) registers pursuant to this title.

(Italics and boldface added.)

Finally, we look to C.J. § 8–211.[16] It states, in part:

### § 8–211. Challenging compliance with selection procedures.

(a) *Motion in criminal cases.*—In a criminal case, before the voir dire examination begins, the defendant or State's Attorney, as the case may be, may move to dismiss the indictment or stay the proceedings on the ground of sub-

---

**15.** This section was formerly codified in Article 33 of the Md.Code.

**16.** Effective October 1, 2006, C.J. § 8–211 will be found in C.J. § 8–409.

stantial failure to comply with the provisions of this title in selecting the grand or petit jury.

* * *

(d) *Remedies for failure to comply with selection procedures.*—If the court determines that there has been a substantial failure to comply with:

(1) The provisions of § 8–103 [17] of this title in selecting a petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.

(2) The provisions of this title, other than those contained in § 8–103, in selecting a petit jury, and this failure is likely to be prejudicial to the moving party, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title. . . .

■ Under the statutory scheme outlined above, we agree with appellant that one must be a United States citizen, as well as a citizen of the jurisdiction where the court convenes, in order to qualify for jury service in Maryland. Clearly, Alade was not qualified to serve as a juror, because he was not a United States citizen at the time of the trial. That conclusion does not end our inquiry, however.

■ Contrary to appellant's contention, his right to a jury composed solely of American citizens derives from statutory law, rather than the federal Constitution or the Maryland Declaration of Rights. Indeed, the right to a jury consisting solely of United States citizens is not so fundamental that it affects "the substantial rights of the accused. . . ." *Kohl v. Lehlback,* 160 U.S. 293, 302, 16 S.Ct. 304, 40 L.Ed. 432 (1895). It follows that the right to a jury comprised only of United States citizens is a right that may be waived. In our view, that is precisely what occurred here. We explain.

■ Along with the jury questionnaire, the voir dire process is designed to ferret out grounds for juror disqualifi-

---

**17.** Effective October 1, 2006, C.J. § 8–103 will be found in C.J. § 8–102 and C.J. § 8–206.

cation, and "give substance to the constitutional guarantee to criminal defendants of a fair and impartial jury trial." *Williams v. State*, 394 Md. 98, 904 A.2d 534 (2006). *See also Curtin v. State*, 393 Md. 593, 903 A.2d 922 (2006) ("Voir dire is the primary mechanism through which the constitutional right to a fair and impartial jury, guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights, is protected."); *Dingle v. State*, 361 Md. 1, 9, 759 A.2d 819 (2000); Md. Rule 4–312. In particular, voir dire "is the process in which prospective jurors are examined through the use of questions . . . to determine the existence of any bias or prejudice" or grounds for disqualification. *Curtin*, slip op. at 7. As the *Dingle* Court said, 361 Md. at 10, 759 A.2d 819:

> Undergirding the voir dire procedure and, hence, informing the trial court's exercise of discretion regarding the conduct of the voir dire, is a single, primary, and overriding principle or purpose: *"to ascertain 'the existence of cause for disqualification.'"*

(Emphasis added.) *See generally Sweet v. State*, 371 Md. 1, 10, 806 A.2d 265 (2002); *State v. Thomas*, 369 Md. 202, 206, 798 A.2d 566 (2002); *Boyd v. State*, 341 Md. 431, 435, 671 A.2d 33 (1996); *Hill v. State*, 339 Md. 275, 279, 661 A.2d 1164 (1995); *Davis v. State*, 333 Md. 27, 36–39, 633 A.2d 867 (1993); *Baker v. State*, 157 Md.App. 600, 613, 853 A.2d 796 (2004).

■ However, the voir dire process depends upon complete and truthful responses by the prospective jurors to the voir dire questions. *Williams*, slip op. at 13. Voir dire may reveal bias through two areas of inquiry: (1) *"whether jurors meet the minimum statutory qualifications for jury service"*; (2) whether a juror has a bias with "'respect to the matter in hand or any collateral matter reasonably liable to unduly influence him.'" *Dingle*, 361 Md. at 9–10, 759 A.2d 819 (quoting *Davis*, 333 Md. at 35–36, 633 A.2d 867) (emphasis added). *See Thomas*, 369 Md. at 207, 798 A.2d 566; *Boyd*, 341 Md. at 436–37, 671 A.2d 33.

■ In this case, appellant never asked the court to pose a single voir dire question aimed at verifying that all members of the venire panel were qualified based on the statutory criteria of citizenship. Consequently, Alade slipped through the jury selection process. While appellant may have assumed that the venire panel had been pre-screened based on the jury questionnaire, it is easy to anticipate that mistakes do occur, which is why a questionnaire alone is not the sole tool used to select a jury. Therefore, the use of the form does not eliminate the need to verify qualification of the venire by way of voir dire. Waiver principles apply to the failure to pose voir dire questions aimed at verifying that venire satisfies the statutory qualifications.

■ In *Kohl, supra,* 160 U.S. at 293, 16 S.Ct. 304 (1895), the defendant was convicted of murder and sentenced to death. He argued that he was deprived of his constitutional rights because one of the jurors in his case was not a United States citizen. As the Supreme Court recognized, "alienage of a juror is cause of challenge, but is not per se sufficient to set aside a verdict, and this whether the complaining party knew of the fact or not." *Id.* at 300, 16 S.Ct. 304. The Supreme Court also said:

> The disqualification of alienage is cause of challenge propter defectum,[18] on account of personal objection and, if voluntarily, or through negligence, or want of knowledge, such objection fails to be insisted on, the conclusion that the judgment is thereby invalidated is wholly inadmissible. *The defect is not fundamental as affecting the substantial rights of the accused, and the verdict is not void for want of power to render it.*

*Id.* at 302, 16 S.Ct. 304 (emphasis added.)

By way of analogy, *Hunt v. State,* 345 Md. 122, 691 A.2d 1255, *cert. denied,* 521 U.S. 1131, 117 S.Ct. 2536, 138 L.Ed.2d

---

**18.** *Black's Law Dictionary* (8th ed.1999), at 245 defines "challenge propter defectum" as follows: "A challenge based on a claim that the juror is incompetent to serve on any jury for a reason such as alienage, infancy, or nonresidency."

1036 (1997), is also instructive. Although convicted felons are statutorily barred from jury service in Maryland, the *Hunt* Court established that a criminal defendant does not have a constitutional right to a new trial if a convicted felon mistakenly serves on the jury.

Hunt was convicted of murder and sentenced to death. *Id.* at 127, 691 A.2d 1255. He complained that the circuit court erred when it found that he was not deprived of his right to an impartial jury at his capital sentencing trial even though, *inter alia,* a juror failed to disclose, both at jury orientation and during voir dire, a pending misdemeanor theft charge that would have statutorily disqualified her from jury service under C.J. § 8–207(b)(5), and would have been a basis for a challenge for cause. *Id.* at 140–41, 691 A.2d 1255.

In denying Hunt's appeal, the Court recognized that voir dire is aimed at uncovering jurors who are statutorily disqualified. It said, *id.* at 141, 691 A.2d 1255 (emphasis added):

> The " 'right' to examine potential jurors, inherent in the constitutional right to a fair trial and impartial jury, translates into a defendant's right to have certain questions propounded to the jurors ... 'concern[ing] a specific cause for disqualification.' " *Boyd v. State,* 341 Md. 431, 436, 671 A.2d 33, 36 (1996) (quoting *Hill v. State,* 339 Md. 275, 280, 661 A.2d 1164, 1166 (1995)); *see also Bedford v. State,* 317 Md. 659, 670, 566 A.2d 111, 116 (1989) ("Maryland Declaration of Rights Article XXI guarantees a defendant the right to examine prospective jurors to determine whether any cause exists for a juror's disqualification."). *These "causes" may take two forms: disqualification for bias or disqualification for failure to meet minimum statutory requirements for jury service.*

With regard to challenges based on statutory criteria, the *Hunt* Court addressed the method for "uncovering information concerning the prospective juror's age, literacy, or criminal background, for which minimum requirements exist as prerequisites to service." *Id.* at 142, 691 A.2d 1255. Noting that Title 8, Subtitle 2 of the Courts and Judicial Proceedings

Article "necessarily embodies the Sixth Amendment's right to an impartial jury," it pointed out that the "rights are statutory in nature" and, "[o]rdinarily, their violation may only be vindicated by invocation of the statutorily-prescribed remedy." *Id.* at 143, 691 A.2d 1255. Quoting from *Boyd v. State, supra,* 341 Md. at 441, 671 A.2d 33, the *Hunt* Court said: " 'Maryland courts screen juror qualifications on at least three levels: a statutorily-required qualification form, appearance before the jury judge or commissioner at the courthouse, and the trial judge's observance of each juror during the *voir dire.*' " *Id.* at 143, 691 A.2d 1255.

Further, the Court stated: "The guidelines set forth in C.J. § 8–207, which delineate the minimum qualifications for service, are the means by which the selection of a representative venire is effected." *Id.* at 143, 691 A.2d 1255. It also admonished that the language of C.J. § 8–211 "is clear and very specific," and that the failure to file a motion under C.J. § 8–211(a) "results in *waiver* of the statutory remedies provided in C.J. § 8–211(d)." (Emphasis added.) *Id.* at 146, 691 A.2d 1255 citing *United States v. Boney,* 977 F.2d 624 (D.C.Cir. 1992) (failure to "challenge properly the jury for improper selection waives the issue").

Of import here, the *Hunt* Court determined that, after completion of voir dire, the defendant "lost the statutory remedy and must labor under constitutional or common law principles." *Id.* at 144–46, 691 A.2d 1255. It reasoned, *id.* at 146, 691 A.2d 1255 (citations omitted):

The Sixth Amendment's guarantee of a fair trial and impartial jury is the touchstone of our justice system.[ ] What is required of jurors is that they be without bias or prejudice for or against the defendant and that their minds be free to hear and impartially consider the evidence and render a fair verdict thereon. Furthermore, " '[b]ias on the part of prospective jurors will never be presumed, and the challenging party bears the burden of presenting facts . . . which would give rise to a showing of actual prejudice.' " If a criminal defendant undertakes to challenge a juror on grounds of bias, the attack must be affirmatively advanced

at the time of trial. It may not be raised for the first time in a collateral attack upon the conviction and/or sentence.

In an effort to distinguish the case *sub judice* from *Hunt,* appellant argues:

> The fact that Mr. Alade disclosed his non-citizenship status within hours of the rendition of the verdict, and the fact the issue was raised in this case pursuant to a ten-day motion, place it in a markedly different procedural posture than were the circumstances of the *Hunt* case. In short, the concerns implicated in *Hunt* as it regards efficiency and finality of judgment are simply not present here.

We see appellant's position as a distinction without a difference. That Alade's status was disclosed within hours after the verdict was rendered does not alter the fact that the trial was already over.

*Hansel v. Collins,* 180 Md. 100, 23 A.2d 1 (1941), supports our view that appellant waived his right to complain about Mr. Alade's jury service. There, the appellant filed a bill of complaint to set aside the judgment on the ground that the jury foreman had been a resident of West Virginia and had registered to vote in that state in 1940. *Id.* at 101, 103, 23 A.2d 1. The juror worked in Allegany County, however, and his name remained on the voter rolls of that county. *Id.* at 103, 23 A.2d 1. The Court of Appeals declared, *id.:*

> Appellant could have made proper inquiry and objected before the juror was sworn which he did not do, but waited until over four months after he had lost the case to present this matter to the court, nor has he shown that his rights were prejudiced by the service of this juror.

*See also Young v. Lynch,* 194 Md. 68, 72, 69 A.2d 787 (1949) (judgment affirmed where, after trial, it was shown that brother of juror whose name was selected had been seated; mistake occurred without fraud or dishonesty and could have been discovered by defendant before jury was sworn); *Vaccaro v. Caple,* 33 Md.App. 413, 417, 365 A.2d 47 (1976)("The rule is ... when a juror who might otherwise be disqualified for cause is permitted to serve on a jury because of the failure of

the aggrieved party to use due diligence in discovering the irregularity, a judgment of that jury will not be disturbed."); *Leach v. State,* 47 Md.App. 611, 425 A.2d 234 (1981) (during voir dire, juror failed to disclose her acquaintanceship with a State witness, who was a homicide detective; the omission was discovered on cross-examination; in its discretion, trial court was entitled to accept juror's assurance that she could serve without bias); *Burkett v. State,* 21 Md.App. 438, 445, 319 A.2d 845 (juror inadvertently failed to respond to a voir dire inquiry that would have revealed that he was the father of a secretary in the prosecutor's office; Court ruled that grant of a new trial is left to the sound discretion of the trial court unless "actual prejudice" to the accused is shown or the information that was withheld creates "a reasonable belief that prejudice or bias by the juror against the accused is likely"), *cert. denied,* 272 Md. 738 (1974).

Here, the trial court expressly found that Owens had a reasonable opportunity to challenge Mr. Alade's qualifications to serve as a juror during the voir dire process. Yet, appellant's counsel did not request any questions to citizenship. And, the trial judge stated that, "[h]ad such a question been requested, the court would in all likelihood have made the inquiry...." We have no reason to disbelieve the judge.

Other jurisdictions have considered the issue presented here. These cases provide guidance.

In *People ex rel. Ostwald v. Craver,* 272 A.D. 181, 70 N.Y.S.2d 513 (N.Y.App.Div.1947), the defendant was convicted of a criminal offense and the prosecutor, upon later discovering that one of the jurors was not a United States citizen, moved to set aside the verdict on the ground that the jury was illegally constituted. The motion was granted, and a new trial was ordered. The defendant later filed for a writ of habeas corpus, which was granted. On appeal by the state, the court held that, because the conviction was set aside, the defendant could not be re-tried for the same offense. However, the court also observed that the defendant's conviction was "not

illegal, and should not have been set aside." *Id.* at 183, 70 N.Y.S.2d 513. It stated, *id.*:

*An objection to the qualification of a juror is available only upon a challenge. It must be taken when the juror appears and before he is sworn.* Code of Criminal Procedure, section 369. The Constitution does not prescribe the qualifications of jurors. It guarantees the right of trial by jury, . . . but the method of selecting persons deemed qualified to act as jurors is left to the Legislature. *People v. Cosmo,* 205 N.Y. 91, 98 N.E. 408, 39 L.R.A., N.S., 967. *The Legislature has prescribed the qualifications of a juror, and citizenship is one of these. Judiciary Law, section 502.* **The lack of such a technical qualification, however, may be waived, either with knowledge or by failure to make an inquiry when the juror is called and before he is sworn.**

(Italics and boldface added.)

More recently, in *Moton v. State,* 256 Ga.App. 594, 569 S.E.2d 264 (2002), the Georgia Court of Appeals upheld the denial of a motion for a new trial filed by a criminal defendant who complained that, in violation of Georgia law, his jury included a person who was not a United States citizen. *Id.* at 266. Among other things, Moton claimed that the juror failed to respond truthfully on the juror questionnaire to a question about her citizenship, which was not discovered until after Moton's trial.

The court observed that Moton never asked the juror about her citizenship during voir dire, nor did he object to her service as a juror. *Id.* at 266. Therefore, the court ruled that he was not entitled to a new trial based on the juror's status as a foreign national. In rejecting Moton's due process claim, the court stated, *id.* at 267:

[E]ven if aliens can be excluded from a jury, it does not necessarily follow that an alien's participation on a jury deprives a defendant of due process. [The juror in question] testified in Moton's hearing on motion for a new trial that, although she was from Jamaica, English was her

primary language, she understood what was happening at the trial, and she applied the law as instructed by the trial court. Thus, Moton cannot show that [the juror's] participation on his jury deprived him of any of his constitutional rights.

Notably, with respect to waiver, the court said that "a challenge *propter defectum*," i.e., a claim of incompetency based on alienage, infancy, or residency, "must be discovered and made before trial." *Id.* at 266. It also stated: " 'A juror incompetent *propter defectum* is made specially competent by the act of the parties in allowing him to serve without challenge, and a verdict will not be set aside for such cause.' " *Id.* (Citation omitted.)

To be sure, the court recognized that, when a juror fails to answer correctly a question on a juror questionnaire, and a correct response would have disqualified the juror, the defendant may be entitled to a new trial if he shows that the juror failed to answer truthfully. *Id.* at 267. However, the defendant in *Moton* could not show that the juror failed to answer truthfully a question about citizenship. In the case *sub judice*, the court found that Alade did not deliberately misrepresent his status as a citizen. Rather, it found that his incorrect response was the result of an "oversight."

Appellant relies on *Perkins v. Smith*, 370 F.Supp. 134 (D.Md.1974), *aff'd*, 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976), to support his argument that he was deprived of his constitutional right to a fair trial. In *Perkins*, a resident alien of Maryland brought an action challenging his exclusion from jury service based solely on his alien status. In rejecting Perkins's challenge, the lower court articulated, *id.* at 138:

> In maintaining the jury system as "the very palladium of free government" the states logically can anticipate that native-born citizens would be conversant with the social and political institutions of our society, the customs of the locality, the nuances of local tradition and language. Likewise naturalized citizens, who have passed through the citizenship classes sponsored by the Immigration and Natu-

ralization Service, have demonstrated a basic understanding of our form of government, history and traditions. There is no corresponding basis for assuming that resident aliens, who owe allegiance not to any state or to the federal government, but are subjects of a foreign power, have so assimilated our societal and political mores that an equal reliance could be placed on their performing as well as citizens the duties of jurors in our judicial system.

The nature of the operation of juries makes it apparent that persons unfit for jury service can work a great deal of harm, through inability or malice, to efficiency and fairness. Jury deliberations are perhaps the most secret form of decision-making in the nation; the means of persuasion used by jurors on each other are never revealed. A single juror who failed to understand the import of the evidence being presented or who lacked any concern for the fairness of the outcome could severely obstruct or distort the course of justice. A single persuasive and unprincipled juror could even direct the course of justice into channels deliberately chosen for their deleterious effect on this country. We conclude, therefore, that the state has a compelling interest in the restriction of jury service to those who will be loyal to, interested in, and familiar with, the customs of this country.

Resident aliens by definition have not yet been admitted to citizenship. Until they become citizens, they remain in most cases legally bound to the country of their origin. Nothing is to prevent their return to that country, or a move to yet a third nation. It is true that many, if not most, aliens do intend to become citizens, and that their loyalty could probably be counted upon. However, it is the process of filing for citizenship that establishes that loyalty; any attempt at prior screening would undercut the efficiency and significance of existing procedures. Therefore, although the presumption that all aliens owe no allegiance to the United States is not valid in every case, no alternative to taking citizenship for testing allegiance can be devised, so

that we conclude that the classification is compelled by circumstances, and that it is justifiable.

To be sure, *Perkins* made clear that courts *may* exclude non-citizens from their juries. But, the court did not say that non-citizens *must* be excluded, or that a defendant is necessarily entitled to a new trial whenever a non-citizen happens to serve on a jury.

The cases cited above persuade us that appellant waived his right to complain about Mr. Alade's lack of citizenship. Although appellant had an opportunity to challenge Mr. Alade's qualifications to serve as a juror during voir dire, he did not avail himself of this opportunity.

■■■ Even if there were no waiver, we are of the view that Mr. Alade's status as a foreign national does not automatically compel a reversal. By way of analogy, we look to other jurisdictions that have addressed the effect of the presence of felons on juries, in violation of applicable statutes. Like Maryland, these courts have concluded that this circumstance does not automatically justify a new trial.

In *Boney, supra,* 977 F.2d 624, the defendants discovered after trial, but before sentencing, that the jury foreman was a convicted felon. *Id.* at 628. Nevertheless, the trial court denied their motion for a new trial, without a hearing. *Id.* On appeal, the defendants argued that, because the juror was statutorily ineligible to serve, his presence on the jury constituted reversible error. *Id.* at 633. Rejecting that contention, the court said:

The Sixth Amendment right to an impartial jury ... does not require an *absolute bar* on felon-jurors. The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is protection against juror bias. A per se rule would be appropriate, therefore, only if one could reasonably conclude that felons are always biased against one party or another. But felon status, alone, does not necessarily imply bias. In fact, as the dissent suggests, Congress' purpose in restricting felons' jury service may stem from considerations other than a concern for biased jurors.... *We think, therefore, that the Sixth Amend-*

*ment guarantee of an impartial trial does not mandate a per se invalidation of every conviction reached by a jury that included a felon.*

*Id.* (boldface added) (footnote and citations omitted). Therefore, the court remanded the case for a hearing at which the appellants would have an opportunity to prove that the juror's failure to disclose his status as a felon revealed actual bias. *Id.* at 634–35.

In *United States v. Humphreys,* 982 F.2d 254 (8th Cir.1992), the Eighth Circuit held that a new trial was not required because a felon sat on a jury that convicted the defendant of income tax evasion. The juror revealed his prior conviction during voir dire but mistakenly indicated that his civil rights had been restored. The defendant moved for a new trial based on the juror's participation in the verdict. The court held that a defendant presenting such a post-verdict challenge had to demonstrate actual bias or prejudice affecting the juror's impartiality and the fairness of the trial. *Id.* at 261.

 We agree with the trial court that Mr. Alade's service on the jury did not infringe Owens's due process right to a fair and impartial jury, merely because of his status as a foreign national. The "due process clause of the fourteenth amendment and Article 21 of the Maryland Declaration of Rights guarantee the right to an impartial jury to the accused in a criminal case." *Couser v. State,* 282 Md. 125, 138, 383 A.2d 389 (1978). But, in this case, there was no showing of prejudice or any allegation that Mr. Alade lacked the ability to perform his duties impartially and intelligently because of his status as a Nigerian. To the contrary, the court found that there was "no showing that Mr. Alade's non-citizen status in any way or manner prejudiced the Defendant's case, his consideration of the evidence, or the jury's deliberations." Therefore, it was satisfied that appellant's due process rights were not infringed.

 As the Court reiterated in *Hunt,* 345 Md. at 146, 691 A.2d 1255: " ' "[b]ias on the part of prospective jurors will *never* be presumed, and the challenging party bears the burden of presenting facts ... which would give rise to a

showing of actual prejudice." ' " (quoting *Davis*, 333 Md. at 38, 633 A.2d 867) (in turn quoting *Borman v. State*, 1 Md.App. 276, 279, 229 A.2d 440 (1967)). Appellant did not establish bias.

The recent case of *Williams v. State*, 394 Md. 98, 904 A.2d 534 (2006), does not alter our conclusion. In that case, the defendant was charged with distribution of cocaine and other related offenses. *Id.* at 102, 904 A.2d 534. The Court considered whether the defendant was entitled to a new trial because a juror failed to disclose, during voir dire, that a member of the juror's family was employed as a secretary in the prosecutor's office, and "the relationship was not discovered until after the trial was completed." *Id.* at 101, 904 A.2d 534.

> During voir dire, the venire panel was asked whether
> ". . . any member of the panel, any member of your immediate family or household or anyone else that you're close to and get significant advice from, been in the past, going to be in the future or are currently employed or doing business with or otherwise closely associated with any law enforcement agency? That includes the City Police, the County Police, the State Police, or any other kind of police. The [A]ttorney General for the State of Maryland or any other State, the State's Attorney's Officer [sic], Baltimore City, Baltimore County, and other State or District Attorney's office, the United State's [sic] Attorney [sic] Office for the Federal District of Maryland or any other federal district, Federal law enforcement agencies including but not limited to FBI, DEA, ATF, INS, IRS, Customs, Coast Guard, Military Police, NSA, CIA, Homeland Security or any other type of outfit that either has a security function or has an investigative function? Also, include parole and probation agents, sheriff's departments, correctional officers and other employees of correctional facilities and people who work for private security companies, then be prepared to tell us about that when you come up."

*Id.* at 102–03, 904 A.2d 534.

As noted, the juror in question did not disclose a familial relationship with the prosecutor's office. After trial, the State

advised appellant of the familial connection, and appellant filed a motion for new trial. *Id.* at 103, 904 A.2d 534. At the motion hearing, the prosecutor acknowledged the juror's familial connection, *id.* at 104, 904 A.2d 534, but did not know why the juror failed to disclose the relationship during voir dire. Nor was the juror present "to testify as to the reason for the non-disclosure." *Id.* In denying the new trial motion, the trial court said, *id.* at 105, 904 A.2d 534:

> "Well that's pretty remote; a sister of a secretary in the State's Attorney's Office. If the Court of Appeals wants to grant a new trial on that basis they're more than welcome to do it. We struggle in Baltimore with an electorate with less than a high school education, that is not very sophisticated, and doesn't understand the simplest of questions. If the Court of Appeals wants to create laboratory circumstances and create precision in each trial, which pre-supposes that jurors will come in here that come in and understand simple English questions, or a defendant gets multiple trials at great expense to the taxpayers, let them do so. I'm not going to. Motion for New Trial is denied."

The Court of Appeals reversed. *Id.* at 105, 904 A.2d 534. In so doing, the Court distinguished *Williams* from our decisions in *Burkett v. State, supra,* 21 Md.App. 438, 319 A.2d 845, and *Leach v. State, supra,* 47 Md.App. 611, 425 A.2d 234. The Court explained:

> In both *Burkett* and *Leach,* the trial judge, upon discovery of the jurors' non-disclosure of a relationship that was the subject of voir dire inquiry, recognizing the potential for prejudice, *questioned the jurors, on the record, to determine whether there was, or cause to be concerned about, prejudice. Only after that inquiry and on the basis of the findings it made on the basis of the information it disclosed did, or could, the trial court exercise its discretion with respect to the requested relief.* With no comparable inquiry as a predicate in this case, the trial judge, concluding that the relationship not disclosed was "pretty remote," and,

therefore, not sufficient to support a new trial, denied the Williams' [sic] motion for new trial.

*Williams*, 394 Md. at 112, 904 A.2d 534 (emphasis added).

The Court continued, *id.* at 113–15, 904 A.2d 534 (emphasis added):

In both *Burkett* and *Leach,* the trial court was able to perform its "focal point" role. It was able to conduct the further investigation and delving into the juror's state of mind, albeit after the fact. As a result, *the court was able to satisfy itself, and was satisfied, that the non-disclosure was inadvertent, that, in other words, there was no basis to believe that the juror was biased or otherwise not impartial.*[ ]

\* \* \*

We hold that, *where there is a non-disclosure by a juror of information that a voir dire question seeks and the record does not reveal whether the non-disclosure was intentional or inadvertent,*[ ] *the defendant is entitled to a new trial.*

Of import here, Chief Judge Bell, writing for the four-member majority, underscored the importance of an evidentiary hearing, at which the juror is present, as a predicate to the trial court's exercise of discretion. The Court reasoned:

We endeavor to be clear on this point. Where the juror is available for further voir dire and is further voir dired, a trial court may exercise the discretion *Burkett* requires it to exercise. But, the trial court's sound discretion can only be exercised *on the basis of the information that the voir dire reveals and the findings the trial court makes as a result.* On the other hand, where the juror is not available or is not voir dired, there simply is neither a basis for the findings of fact, which must form the predicate for the exercise of discretion, nor for the exercise of discretion that *Burkett* contemplates.

In a footnote, the Court elaborated, *id.* at 115, 904 A.2d 534, n. 9.:

As should be obvious, that result [of a new trial] is the product of a record that was so deficient as not to have

permitted this Court, or the trial court, for that matter, to make a finding as to why the juror not did disclose her familial relationship. Speculation from an inadequate record simply will not do.

Even if we regard Alade's incorrect answer on the questionnaire as comparable to an incorrect response to a voir dire question or a failure to disclose, the instant matter is easily distinguished from *Williams*. Unlike in *Williams*, the court below conducted an evidentiary hearing to explore why Alade stated on the questionnaire that he was qualified to serve. The juror explained that he simply "missed" the portion of the form regarding categories for disqualification. In its ruling, the trial court expressly found that Alade's testimony was "credible." Further, the court determined that the juror's "failure to note that he was not a citizen of the United States was simply an oversight." And, it found that "Mr. Alade did not provide a dishonest response to the citizenship question."

In addition, the court was of the view that the "questionnaire itself is confusing," which apparently contributed to the juror's mistake. The court explained: "As reflected on Court's Exhibit A, a person can 'check off' that he or she is qualified to serve as a juror before even seeing the disqualifying factors listed below."

Finally, the court ruled that "the presence of Mr. Alade on the jury" did not deny appellant "a fair and impartial trial" or violate his due process rights. It explained: "The mere presence and participation of a juror who would have been disqualified by statutory provisions is not a basis for a new trial absent a showing of bias or prejudice. The Defendant has failed to make such a showing."

Accordingly, unlike in *Williams*, the record reveals that Mr. Alade's mistaken response was fully explored by the trial court at an evidentiary hearing. The court found that the error was unintentional and inadvertent, and did not result in any bias or prejudice to appellant. These core findings entitled the court to exercise its discretion, which it did in denying the motion.

## III. Motion to Suppress

### A. Factual Summary

Appellant moved to suppress his oral statements to Detectives Eric Kruhm and Vickie Shaffer at the Hospital, claiming that they were made during custodial interrogations and that the detectives failed to advise him of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This claim is without merit.

Detective Kruhm, of the Howard County Police Department, testified that on July 30, 2003, at about 6:30 p.m., he and Detective Shaffer encountered appellant at the playroom of the Hospital's pediatric ward, with Dacquan. Detective Kruhm "introduced himself and Detective Schaffer" to appellant and "sat down within a few feet of [Owens] and began talking with him." Detective Kruhm informed appellant that they were at the Hospital because of Kevonte's death, and asked appellant a series of questions about the day's events, including "who had the children that day. How long they had been with each person or if anybody had visited the home?"

The detectives spoke with appellant for about ten to fifteen minutes. During their conversation, the detectives did not display their weapons, nor was Owens restrained. Moreover, appellant never indicated that he wanted to end the conversation or leave the playroom. Detective Kruhm added that "we were actually the ones that ended the interview. We got up. We finished and actually left. Myself and Detective Shaffer."

According to Detective Kruhm, appellant told him that he stayed home with the children often, and had the children with him at home all day on July 30, 2003, while his wife was at work. Appellant explained that, after lunch, Kevonte and Dacquan fell asleep until about 5:00 p.m. and, when he went to awaken them, Kevonte was unusually tired. According to Detective Kruhm, appellant said that by the time they arrived at Ms. Davis's work to pick her up, Kevonte's lips had turned blue.

Detective Kruhm described appellant as appearing nervous during the conversation. He noted that Owens twice muttered to himself, once saying, "Fucking up," and once saying, "How does this shit happen?" When Detective Kruhm confronted appellant with the fact that Kevonte had bruises on his sternum and face, appellant suggested the cause might be attributable to the fact that Kevonte and Dacquan tended to fight with each other.

Detective Kruhm and Detective Shaffer next spoke to appellant at approximately 9:48 p.m. that evening, while in the Hospital's pediatric ward. Kruhm told appellant "that [they] wanted to talk to him a little further, and that [they] wanted to tape the interview." Detective Kruhm explained that he wanted to audiotape the conversation because he "didn't want to take a lot of notes," and "wanted to pay attention to what [appellant] had to say." Appellant did not object.

Of significance to the motion, the following exchange ensued at the end of the interview:

[APPELLANT]: Is there anything else before I go?

[DETECTIVE KRUHM]: You can leave any time; we're not holding you in here anymore.

[APPELLANT]: All right. See you tomorrow.

Detective Kruhm testified that appellant was neither handcuffed nor restrained during the second interview. The detectives were not in uniform, nor were their weapons displayed. Moreover, Detective Kruhm claimed that they did not threaten appellant, nor did they make any promises to him.

During cross-examination, Detective Kruhm acknowledged that appellant was a suspect immediately after the first interview. He also indicated that he might have obtained appellant's car keys from him before the second interview. The following exchange is relevant:

[APPELLANT'S COUNSEL]: Did there come a time that you came into possession with [sic] car keys to the Honda?

[DETECTIVE KRUHM]: I believe I did.

[APPELLANT'S COUNSEL]: Okay. And how and where did that happen?

[DETECTIVE KRUHM]: I don't remember where, but I believe I had [a] conversation with Mr. Owens telling him that I needed the keys to the vehicle.

[APPELLANT'S COUNSEL]: Would that be one of the two conversations that you've already referenced?

[DETECTIVE KRUHM]: I don't believe so.

[APPELLANT'S COUNSEL]: Okay. When would it have been in relation to those two conversations.

[DETECTIVE KRUHM]: When the Search Warrant was going to happen on the vehicle.

[APPELLANT'S COUNSEL]: When was that in relation to these two conversations?

[DETECTIVE KRUHM]: I don't remember.

[APPELLANT'S COUNSEL]: Okay. Quite possibly after the first and before the second.

[DETECTIVE KRUHM]: That's possible, yes.

[APPELLANT'S COUNSEL]: Yes. And do you have any recollection of where that conversation you had with Mr. Owens took place?

[DETECTIVE KRUHM]: No, I don't.

[APPELLANT'S COUNSEL]: All right. Could it have been outside by the parking lot?

[DETECTIVE KRUHM]: It could have been.

[APPELLANT'S COUNSEL]: And it could have been prior to the second conversation you had in room eleven?

[DETECTIVE KRUHM]: I don't remember.

Detective Schaffer testified that the interviews with appellant occurred before the execution of the search warrant for the Honda. His testimony was largely consistent with that of Detective Kruhm. He indicated that, prior to the second interview, they approached appellant and told him that they "needed to speak with him again." Then, they found an empty room and brought appellant there for that purpose.

Appellant explained that, after the first interview, he went outside to get "some air," and because he "needed to go to the car to get a phone number so [he] could call [his] friend to let him know what was going on so he could come and get [him]." While Owens was outside, next to his car, talking on his cell phone, the detectives approached him for the second time and indicated that they needed to ask him "some more questions and to come with them." The detectives told him "they also needed the keys to the house and car." Accordingly, appellant gave the detectives his keys and followed them into the Hospital. Appellant stated that he "didn't really think [he] had a choice whether to answer the Detectives' questions, and that he did not feel free to leave during either interview."

Appellant confirmed that he was neither handcuffed nor restrained during either interview. He also confirmed that neither detective stopped him when he said he wanted to leave the room, nor did he indicate that he did not want to proceed with either interview. Appellant acknowledged that the second interview concluded when he stated, "I don't want to talk to you anymore."

The court denied the motion to suppress. It stated that it considered a number of factors, explaining:

> One, is when and where the interrogation occurred. In this case there were two different occasions when Mr. Owens talked to detectives. They both took place in the hospital. The first conversation took place in a playroom, and the second one was in a patient room, close to where the victim had been kept prior to the victim's death.
>
> In both instances, Mr. Owens was already in the hospital. When he went in to the playroom, the detectives were already there, the conversation ensued. The later conversation was at the detectives' request when they went in to a patient room.
>
> I also need to consider the length of each interrogation. In both instances they were short, as I recall, maybe fifteen to twenty minutes on each occasion. So, they were not lengthy interrogations.

The third factor is the number of police officers that were present. In both instances, there were two officers present when conversations with Mr. Owens took place.

I also need to consider what the officers and suspect said, or did. These were all, obviously, conversations where the detectives were trying to seek information from Mr. Owens about what occurred on a particular day in question when his stepson was taken to the hospital.

When Mr. Owens testified in these proceedings, . . . and I should have mentioned in the beginning, I did take into account all of the testimony and evidence presented, including the assessing of the credibility of the witness, and I did review the cases that counsel asked me to review. But, in determining what was said or done— . . . Mr. Owens testified on cross-examination that he never said that he did not want to talk to the detectives, and he never said that he did not want to answer anymore questions.

There is one point in the interview where Mr. Owens indicated that he felt the detectives were trying to coerce him. At that point, the interview ended, and he was free to leave.

That fact also addresses another factor as to whether or not he was physically restrained. At no time during any of the interrogations was Mr. Owens physically restrained.

There was some testimony as far as everybody's relative location in the two rooms. In no instance do I find that the placement of persons in the room, in any manner, restricted Mr. Owens from being able to leave, had he chosen to leave.

He was—I believe he had testified in cross-examination, or maybe it was on direct, um, and the detectives indicted that he was never told that he could not leave. And, in fact, at the time when he thought he was being coerced, he was able to leave, and he [w]as not stopped, in any respect, from trying to leave.

Another factor is whether there was a show of force. There were no threats made to Ms. Owens, according to his

own testimony. Additionally, the officers had weapons, but they were never drawn.

Another factor is how he got to the place of questioning. As I indicated, he was already at the hospital, because his stepson had been admitted to the hospital, so he was not at that location at the police officers' request.

Final factor to be considered is whether he was detained, or arrested. He was not arrested that evening; in fact, he was arrested two days later. So, from that standpoint, this also gets into any physical constrains. There were no such constraints upon his ability to leave.

So, considering the totality of the circumstances I find, that based upon the testimony and evidence presented in my review of applicable case law, that this was not a custodial interrogation in either event, so *Miranda* warnings were not required prior to the questioning.

I also find that a reasonable person in Mr. Owens' circumstances would have felt free to leave, and that this was not a coercive environment.

### B. Discussion

Appellant contends that, under our holding in *Bond v. State*, 142 Md.App. 219, 788 A.2d 705 (2002), "the trial court erred in denying [his] motion to suppress." He argues:

[I]t is clear that the two officers wearing weapons approached Appellant in the unfamiliar atmosphere of a hospital waiting room on the heels of learning of the death of his stepson and commenced to question him about their investigation. Certainly an ordinary person under such circumstances would feel intimidated and unable to end the encounter. Indeed, the officers dictated the contours of the initiation and termination of the interrogation. As it regards the second interrogation, the officers sought out Appellant ... they indicated that they "need[ed] to speak with him again," they took his car keys from him; they led him to the private environs of an unoccupied patient room; they sat him with his back to the wall; they closed the door;

they proceeded to interrogate him with an audio tape-recorder in an accusatory manner by offering repeated expressions of his guilt and rejecting his denials of culpability. And although [the] Detective testified [that] Appellant was not under arrest and that he was "free to leave," it is inconceivable that Appellant felt, or was in fact, free to leave when, after he was compelled to ask[ ] permission to leave, he was advised, "We're not holding you in here anymore." ... Appellant was clearly in police custody when the detectives were interrogating him for the second time, he was not advised of his rights under *Miranda* before being subjected to the custodial interrogation, and the trial court's denial of his motion to suppress was error. The error requires reversal.

The State counters that "the record and controlling authority fully support the circuit court's ruling." Quoting *Argueta v. State*, 136 Md.App. 273, 279, 764 A.2d 863, *cert. denied*, 364 Md. 142, 771 A.2d 1071 (2001), it asserts: " '[P]reliminary to any decision to exclude evidence because it was gathered from the criminal suspect who was not advised of his *Miranda* rights is a determination of whether that evidence constitutes a statement stemming from custodial interrogation.' " (Citations omitted; internal quotations omitted). It adds: "The threshold in deciding the applicability of *Miranda* is whether the person being questioned has been taken into custody or deprived of his freedom in some significant manner.' " (Citations omitted). Moreover, it contends:

[T]he trial court thoroughly reviewed the facts established at the suppression hearing, including reviewing the audio-tape made by Owens. The Court found that the interrogations were not lengthy, that Owens never said that he did not want to talk with the officers, that Owens was free to leave and was not stopped when he did leave, that no threats were made to Owens, and that Owens was not restrained or under arrest and, in fact, was not arrested until two days later. Based upon the evidence before it, the suppression court properly concluded "that a reasonable person in Mr. Owens' circumstances would have felt free to

leave, and that this was not a coercive environment," and held "that this was not a custodial interrogation in either event, so *Miranda,* warnings were not required prior to the questioning."

Our review of the trial court's ruling with respect to a suppression motion is based solely on the record of the suppression hearing. *State v. Collins,* 367 Md. 700, 706–07, 790 A.2d 660 (2002); *Cartnail v. State,* 359 Md. 272, 282, 753 A.2d 519 (2000); *Cooper v. State,* 163 Md.App. 70, 84, 877 A.2d 1095 (2005); *Freeman v. State,* 158 Md.App. 402, 408 n. 3, 857 A.2d 557 (2004). We review the evidence in the light most favorable to the State as the prevailing party. *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990); *Whittington v. State,* 147 Md.App. 496, 515, 809 A.2d 721 (2002), *cert. denied,* 373 Md. 408, 818 A.2d 1107 (2003), *cert. denied,* 540 U.S. 851, 124 S.Ct. 136, 157 L.Ed.2d 92 (2003). Moreover, we extend great deference to the fact-finding of the motion court, accepting the facts as found, unless clearly erroneous. *State v. Green,* 375 Md. 595, 607, 826 A.2d 486 (2003); *Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491 (1999).

Nevertheless, we must make our own independent constitutional appraisal as to the admissibility of a defendant's statements, by reviewing the law and applying it to the facts of the case. *Crosby v. State,* 366 Md. 518, 526, 784 A.2d 1102 (2001), *cert. denied,* 535 U.S. 941, 122 S.Ct. 1325, 152 L.Ed.2d 233 (2002); *Wilkes v. State,* 364 Md. 554, 569, 774 A.2d 420 (2001). We accomplish this task by conducting a *de novo* review of the law and applying it to the first-level facts found by the suppression judge. *Nathan v. State,* 370 Md. 648, 659, 805 A.2d 1086 (2002), *cert. denied,* 537 U.S. 1194, 123 S.Ct. 1303, 154 L.Ed.2d 1029 (2003); *Green,* 375 Md. at 607, 826 A.2d 486; *In re David S.,* 367 Md. 523, 529, 789 A.2d 607 (2002).

It is pellucid that the application of *Miranda* is triggered only in a custodial setting. *Miranda,* 384 U.S. at 441, 444, 86 S.Ct. 1602; *see Yarborough v. Alvarado,* 541 U.S.

652, 660, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Thompson v. Keohane*, 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *Fenner v. State*, 381 Md. 1, 9, 846 A.2d 1020 (2004); *Hughes v. State*, 346 Md. 80, 87, 695 A.2d 132 (1997). Whether a person was in custody during police interrogation is a legal question. *See State v. Rucker*, 374 Md. 199, 207, 821 A.2d 439 (2003) ("In determining whether there was custody for purposes of *Miranda*, we accept the trial court's findings of fact unless clearly erroneous," but " '[w]e must . . . make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody' ") (citation omitted); *McAvoy v. State*, 314 Md. 509, 515, 551 A.2d 875 (1989) ("Armed with the facts properly found by the trial judge, we must . . . make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody."); *Allen v. State*, 158 Md.App. 194, 229, 857 A.2d 101 (2004), *aff'd*, 387 Md. 389, 875 A.2d 724 (2005); *Ashe v. State*, 125 Md.App. 537, 549, 726 A.2d 786 (1999) ("Whether appellant was in 'custody' when he made the incriminating statement is a legal question, which we decide *de novo* using the facts found by the circuit court.").

▮▮▮▮▮ " '[C]ustodial interrogation' " means " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *Alvarado*, 541 U.S. at 661, 124 S.Ct. 2140 (quoting *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602). " 'Custody' ordinarily contemplates that a suspect will be under arrest, frequently in a jailhouse or station house setting." *Reynolds v. State*, 88 Md.App. 197, 209, 594 A.2d 609 (1991), *aff'd*, 327 Md. 494, 610 A.2d 782 (1992), *cert. denied*, 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993). But, the concept of "custody" is not necessarily limited to a formal arrest; "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam). As the Supreme Court explained in *Thompson*,

516 U.S. at 112, 116 S.Ct. 457, custody may be found when "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."

"The *Miranda* custody inquiry is an objective test." *Alvarado,* 541 U.S. at 667, 124 S.Ct. 2140. Therefore, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam). Accordingly, the trial court must assess "all of the circumstances surrounding the interrogation," *Stansbury,* 511 U.S. at 322, 114 S.Ct. 1526, and consider "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" *Id.* at 325, 114 S.Ct. 1526. Put another way, "custody must be determined based on how a reasonable person, in the suspect's situation would perceive his circumstances." *Alvarado,* 541 U.S. at 662, 124 S.Ct. 2140; *see Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *see also Allen v. State,* 158 Md.App. 194, 230, 857 A.2d 101, *aff'd,* 387 Md. 389, 875 A.2d 724 (2005).

In *Whitfield v. State,* 287 Md. 124, 139, 411 A.2d 415 (1980), the Court adopted the "objective reasonable person approach to determining custody." Indeed, the Court expressly said that the "subjective intent" of a law enforcement officer is not relevant in resolving the custody issue. *Id.* at 140, 411 A.2d 415. It determined that "'custody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority.'" *Id.* (Citation omitted).

To be sure, "[d]eciding when a person has been significantly deprived of his freedom of action so as to be in custody within the meaning of *Miranda* depends on the factual setting surrounding the interrogation in each case." *Id.* at 139, 411 A.2d 415. In this regard, the trial court must consider, *inter alia,*

whether the suspect was "physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation." *Id.* at 140, 411 A.2d 415 (internal quotation omitted).

The *Whitfield* Court enumerated several factors relevant to the custody determination. It said:

"[T]hose facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning."

*Id.* at 141, 411 A.2d 415 (quoting *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979)).

With this framework in mind, we discern no merit to appellant's challenge to his statements at the Hospital. We explain.

*Allen v. State, supra*, 158 Md.App. 194, 857 A.2d 101, is informative. There, appellant was charged with murder, as well as robbery with a deadly weapon, robbery, theft, and two counts of carrying a weapon openly with intent to injure. At a suppression hearing, appellant moved to suppress several oral and written statements he made to police officers in a store parking lot and at the sheriff's office. *Id.* at 201, 857 A.2d 101.

Two officers testified that they arrived at the parking lot "in response to appellant's call to the sheriff's office, in which he

reported that he had stabbed someone." *Id.* at 232, 857 A.2d 101. On the call, appellant also stated that "he had run a car into a ditch." *Id.* at 201, 857 A.2d 101. Once on the scene, the officers noticed that appellant was covered in blood. *Id.* at 233, 857 A.2d 101. Accordingly, the officers asked appellant if he was injured. After appellant informed the officers that he was not injured, he "voluntarily 'started talking,'" and gave "details of the stabbing." *Id.* at 232, 857 A.2d 101.

After the victim's body was located, appellant was voluntarily taken to a nearby produce stand to discuss the incident. *Id.* at 204, 857 A.2d 101. At the produce stand, he was informed that "he was 'not under arrest'; that he was 'free to leave'; and that he did not have to discuss the incident." *Id.* After appellant agreed to discuss the incident, he was taken to the sheriff's office. *Id.* at 204–05, 857 A.2d 101. "Although he was transported in a police vehicle, appellant was not handcuffed during the ride." *Id.* at 234, 857 A.2d 101. At the sheriff's office, an officer again informed appellant that he "was not under arrest and was free to leave." *Id.* Thereafter, appellant was interviewed about the incident by a police sergeant. But, he was not restrained, nor did the police officer display his weapon. *Id.* Appellant gave oral and written statements. *Id.* at 205, 857 A.2d 101.

In denying appellant's challenge to his statements at the parking lot, we explained: "These brief encounters with appellant were of a limited nature and were made in a public place, during the day, without the use of any weapons or physical restraints." *Id.* at 233, 857 A.2d 101. We also denied appellant's challenge to the statements made at the sheriff's office, noting that appellant "was not under arrest, was free to leave, and did not have to 'discuss the incident' with the detectives." *Id.* at 236, 857 A.2d 101.

*State v. Rucker, supra,* 374 Md. 199, 821 A.2d 439, is also instructive. There, the police received an anonymous tip that Mr. Rucker was dealing drugs. *Id.* at 203, 821 A.2d 439. In

response, they went to a shopping center and parked their marked cruiser behind Mr. Rucker's vehicle. *Id.* at 204, 821 A.2d 439. After asking Rucker for his license and vehicle registration, the uniformed officers asked him if he had "anything he was not supposed to have." *Id.* Mr. Rucker admitted that he had cocaine. *Id.* Rucker moved to suppress his statements and the contraband, complaining that the police should have advised him of his *Miranda* rights, because they initiated what amounted to a "de facto arrest." *Id.* at 206, 821 A.2d 439. The circuit court suppressed the statements and we affirmed. *Id.* at 205–06, 821 A.2d 439. The Court of Appeals reversed, concluding that Rucker was not in custody at the time of his statements. *Id.* at 207, 821 A.2d 439. In reaching its decision, the Court pointed to the following: the questioning occurred in a public place; the questioning lasted only a short period of time; only three officers were present; the officers did not condition the return of the license and registration upon Rucker's cooperation; and only one non-coercive question was asked before Rucker made the incriminating statements. *Id.* at 220–21, 821 A.2d 439. *See also Conboy v. State,* 155 Md.App. 353, 369–73, 843 A.2d 216 (2004) (rejecting claim that the investigatory vehicle stop evolved into a custodial detention, and noting that only one trooper was present; defendant was on a busy street during the day; he was not physically restrained; and the trooper never told him that he was not free to leave).

 Here, Detectives Kruhm and Shaffer interviewed appellant once in the Hospital playroom and again in an empty patient room. Neither interview was very long. Furthermore, appellant was not restrained in any way and was free to leave at any time during the interviews. We are not prepared to adopt appellant's argument that an ordinary person, under similar circumstances, would have felt intimidated and unable to end the encounter. Indeed, it was appellant who terminated the second interview.

## IV. Sufficiency of the Evidence[19]

In his final contention, appellant argues that "the evidence was insufficient to sustain the conviction." He avers that, "[e]ven when viewed in the light most favorable to the State, the evidence in the instant case fails to compel the conclusion that there was any act attributable to Appellant that caused Kevonte's death, let alone a *criminal act,* simply because Kevonte was with Appellant during the day in question." According to appellant, the evidence merely shows that "Kevonte was left alone for an extended period in the company of his brother while Appellant napped with the baby, and it is equally possible that Kevonte suffered an accidental injury that ultimately caused his death."

Appellant suggests that reversal is required because "there is simply no evidence that the killing resulted from 'the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not.' [*Burch v. State,* 346 Md. 253, 696 A.2d 443 (1997)]." He argues:

> In any event, the evidence cannot support a finding, beyond a reasonable doubt, of second degree murder.
>
> Second degree murder embraces a killing accompanied by any one of at least three alternative *mentes reas:* killing another person (other than by poison or lying in wait) with the intent to kill, but without the deliberation and premeditation required for first degree murder; killing another person with the intent to inflict such serious bodily harm that death would be the likely result; and what has become known as depraved heart murder—a killing resulting from "the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not." *Robinson v. State,* 307 Md. 738, 744, 517 A.2d 94,

---

**19.** Appellant does not specifically indicate which convictions he is challenging.

97 (1986), quoting from *DeBettencourt v. State,* 48 Md.
App. 522, 530, 428 A.2d 479, 484 (1981).
 *Burch v. State,* 346 Md. 253, 274, 696 A.2d 443 (1997)
(footnote omitted).

The State counters that "the evidence was sufficient to
support Owens's conviction." In support of its contention, the
State highlights the testimony of Kenesha Davis, Michael
DeVilbis, Lisa Zovko, Dr. Jackson Tsai, Dr. David Monroe,
Dr. Zabiullah Ali, and appellant's own testimony.

 When reviewing a claim based on the sufficiency
of evidence, we must determine "whether the record evidence
could reasonably support a finding of guilt beyond a reason-
able doubt." *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct.
2781, 61 L.Ed.2d 560 (1979); *see State v. Smith,* 374 Md. 527,
533, 823 A.2d 664 (2003); *Moye v. State,* 369 Md. 2, 12, 796
A.2d 821 (2002); *Winder v. State,* 362 Md. 275, 325, 765 A.2d
97 (2001); *State v. Sowell,* 353 Md. 713, 726, 728 A.2d 712
(1999). Evidence is sufficient if, "after viewing the evidence in
the light most favorable to the prosecution, *any* rational trier
of fact could have found the essential elements of the crime
beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99
S.Ct. 2781 (emphasis in original). We review the evidence in
the light most favorable to the prosecution, and will reverse
the judgment only if we conclude that no "rational trier of fact
could have found the essential elements of the crime beyond a
reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781;
*see Facon v. State,* 375 Md. 435, 454, 825 A.2d 1096 (2003);
*Coles v. State,* 374 Md. 114, 122, 821 A.2d 389 (2003); *Moye,*
369 Md. at 12, 796 A.2d 821.

 In regard to sufficiency, the limited question be-
fore an appellate court "is not whether the evidence *should
have or probably would have* persuaded the majority of fact
finders but only whether it *possibly could have* persuaded *any*
rational fact finder." *Fraidin v. State,* 85 Md.App. 231, 241,
583 A.2d 1065, *cert. denied,* 322 Md. 614, 589 A.2d 57
(1991)(emphasis in original). Moreover, it is not the function
of the appellate court to determine the credibility of witnesses

or the weight of the evidence. *Archer v. State,* 383 Md. 329, 370, 859 A.2d 210 (2004); *Jones v. State,* 343 Md. 448, 465, 682 A.2d 248 (1996); *McCoy v. State,* 118 Md.App. 535, 538, 703 A.2d 237 (1997), *cert. denied,* 349 Md. 235, 707 A.2d 1329 (1998). Rather, it is the jury's task to resolve any conflicts in the evidence and assess the credibility of witnesses. *Archer,* 383 Md. at 370, 859 A.2d 210; *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994).

We are amply satisfied that the evidence was more than sufficient to establish the offenses of depraved heart murder, child abuse, and first degree assault. We explain.

In *Burch v. State,* 346 Md. 253, 274, 696 A.2d 443, *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997), the Court of Appeals recognized that "[m]urder is a single crime in Maryland that is divided, by statute, into two degrees." It held that second degree murder "embraces a killing accompanied by any of at least three alternative *mentes reae.*" *Id.* They are:

> killing another person (other than by poison or lying in wait) with the intent to kill, but without the deliberation and premeditation required for first degree murder; killing another person with the intent to inflict such serious bodily harm that death would be the likely result; and what has become known a depraved heart murder—a killing resulting from "the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not."

*Id.* at 274, 696 A.2d 443 (quoting *Robinson v. State,* 307 Md. 738, 744, 517 A.2d 94 (1986) and *DeBettencourt v. State,* 48 Md.App. 522, 530, 428 A.2d 479, *cert. denied,* 290 Md. 713 (1981)).

Second degree depraved heart murder requires "the deliberate perpetration of a knowingly dangerous act with reckless and wanton unconcern and indifference as to whether anyone is harmed or not." *Robinson,* 307 Md. at 744, 517 A.2d 94. The act must be committed " 'under circumstances manifesting extreme indifference to the value of human life.' "

*Id.* at 745, 517 A.2d 94 (citation omitted). The crime of second degree depraved heart murder can be committed with or without an intent to injure. *Id.* at 745, 517 A.2d 94. The *Robinson* Court reasoned, *id.:*

> The terms "recklessness" or "indifference," often used to define ·the crime, do not preclude an act of intentional injury. They refer to "recklessness" or "indifference" to the ultimate consequence of the act—death—not to the act that produces that result.

■ Appellant suggested that the injuries were the result of the children fighting. But, Dr. Ali rejected that theory, explaining that a small child could not have inflicted the injuries sustained by Kevonte. It was the province of the jury to reject appellant's explanation and credit the State's version of events. *See, e.g., Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991) (recognizing that "the credibility of witnesses" is "always [a] matter[ ] for the jury to determine when it is the trier of facts"). And, a witness's credibility goes to the weight of the evidence, not its sufficiency. *Ruth v. State,* 133 Md.App. 358, 365, 757 A.2d 152, *cert. denied,* 361 Md. 435, 761 A.2d 933 (2000) (citation omitted); *see also Cain v. State,* 162 Md.App. 366, 379, 875 A.2d 146 (2005).

■ The State presented expert testimony that established that a tremendous amount of blunt force was inflicted upon the victim, causing rib fractures, bruising of both the lungs and thymus, and tearing of the liver. Moreover, the evidence showed that such injuries could not have been inflicted by the victim's four-year-old brother. In addition, appellant had sole custody of the victim during the time that the injuries were sustained.

■ The evidence supporting appellant's conviction for child abuse was also legally sufficient. Child abuse is defined as "physical injury sustained by a minor as a result of cruel or inhumane treatment or as a result of a malicious act under circumstances that indicate that the minor's health or welfare is harmed or threatened by the treatment or act." Maryland Code (2002, 2005 Supp.), § 2–601 of Criminal Law Article

("C.L."). Surely, appellant's use of deadly force qualified as "cruel or inhumane treatment" or a "malicious act."

C.L. Section 3–202(a)(1) defines the crime of first-degree assault. It provides, in part, that "[a] person may not intentionally cause or attempt to cause serious physical injury to another." "Serious physical injury" is defined as physical injury that: "(1) creates a substantial risk of death; or (2) causes permanent or protracted serious: (i) disfigurement; (ii) loss of the function of any bodily member or organ; or (iii) impairment of the function of any bodily member or organ." C.L. § 3–201(c). Clearly, there was sufficient evidence to support Owens's conviction for first-degree assault.

**JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**